573 A.2d 1317

**Jeffrey SIMS**

v.

**STATE of Maryland.**

**No. 113, Sept. Term, 1988.**

Court of Appeals of Maryland.

May 30, 1990.

Michael R. Braudes, Asst. Public Defender, Alan H. Murrell, Public Defender, both on brief, Baltimore, for petitioner.

Richard B. Rosenblatt, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., both on brief, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL *, JJ.

McAULIFFE, Judge.

Shortly before midnight on 9 September 1986, someone shot and killed Michael Bucino in the parking lot of the 602 Club in Laurel, Maryland. Jeffrey Sims claims that he was not present and did not shoot Bucino, but a jury in the Circuit Court for Anne Arundel County found to the contrary and convicted him of murder in the second degree. Sims does not contest the sufficiency of the evidence to support the jury's finding, but contends that the trial judge erred in refusing to instruct the jury concerning voluntary manslaughter. Sims claims he was entitled to a manslaughter instruction because the evidence fairly generated the question of whether the shooter, 1) acted in hot-blooded response to legally adequate provocation or, 2) was entitled to claim imperfect self-defense. We find no fault with the defendant's attempt to interpose inconsistent theories of defense and mitigation, but hold that the evidence was insufficient to warrant an instruction on manslaughter.

## I

### *Facts*

The victim, Bucino, was known to his friends as "Bear," apparently because he was six feet three inches tall, weighed 327 pounds, and wore a full beard and mustache. He was a regular patron of the 602 Club, and sometimes volunteered his services in maintaining order and in securing the Club and its parking lot at closing. Bucino arrived at the 602 Club sometime between 7 p.m. and 10 p.m. on September 9, and remained there until the bar closed. He drank about two pitchers of beer during that time.

The defendant entered the 602 Club shortly after 11:30 that evening, and ordered a beer. Although "last call" for

---

* Blackwell, J., now retired, participated in the hearing and conference while an active member of this Court but did not participate in the decision and adoption of this opinion.

drinks had been announced earlier, and the bartender had begun his closing duties, Sims was served a beer because the bartender recognized him.[1]  The first words between Sims and Bucino that evening occurred when Sims put a quarter in the jukebox and complained because it did not play.  According to Sims, Bucino said, "[T]hey don't play your kind of music."  Sims is black and Bucino was white. Sims testified that Bucino had also spoken to him on an earlier date, when they were both at the package store adjacent to the bar.  On that occasion, Sims was advised by the clerk that the item he ordered was not in stock, and Bucino gratuitously interjected, "[T]ake what you get, boy."

On the night in question, after the bartender explained to Sims that the jukebox had been turned off for the evening, Sims began talking to an inebriated white female, as well as to another black male who was described as being shorter than Sims.  The manager of the bar heard Bucino say to someone, she did not know to whom, "[Y]ou don't put your hands on a woman in here."  Shortly thereafter, Bucino told the manager that he did not want any trouble, that Sims had been calling him "obscenities" and "fat boy."  Just prior to midnight, Sims, the shorter black male, and the white female left the bar.  As they were preparing to leave, Bucino said to the female, "[W]hy are you leaving with them," or words to that effect.

What happened outside the bar was described by two Navy enlisted men who were stationed at nearby Fort Meade, and who had been in the 602 Club earlier in the evening.  John Harkness, Jr., testified that he and William Stevenson had gone to another bar in the area, the Tack Room, at about 5 p.m., where they each drank one beer. He said they came to the 602 Club about an hour later, and except for a period of approximately an hour when they were out for dinner, spent the rest of the evening in the 602 Club.  Harkness testified he had seen Bucino come into the

---

1.  Sims worked nearby, and for business and social reasons was often in the 602 Club and on its parking lot.

602 Club at about 7 p.m. and realized he had seen him earlier that evening at the Tack Room. He said Bucino was "a little bit rowdy" at the Tack Room, but "didn't do anything" at the 602 Club. Harkness and Stevenson left the 602 Club when last call was announced, apparently before Sims entered. They walked across the street to a convenience store, bought soft drinks and potato chips, and returned to Stevenson's car in the 602 Club parking lot. As he was seated in the car talking to Stevenson, Harkness observed two black males and a white female exit the bar. He said the taller male and the female walked along the front of the building to a beige automobile that was parked near the door to the adjacent package store. The shorter black male went in a different direction to a white car. The shorter black male drove the white car to the area of the beige car, where the other two persons were talking. After what appeared to be a brief conversation, the person in the white car drove out of the parking lot. At this point, the female walked back into the lounge. Other evidence indicated she had left her purse on the bar, and had returned to retrieve it.

A few moments after the female re-entered the bar, Bucino came out, and walked to the area of the beige car. By this time, the taller male was in the beige car. When Bucino was within three to seven feet of the car, he appeared to engage the driver in conversation, and at one point was shaking his finger and appeared to be yelling at the occupant. Harkness said, "[I]t looked like an argument," but because he was approximately 50 to 60 feet away, he could not hear what was said. Bucino then turned and started to walk away from the car. He stopped, turned back, and took a couple of steps toward the car. At that point, Harkness's attention was diverted by a light coming on somewhere else on the lot, and he looked away. He then heard two or three "loud cracks" from the direction of the beige car. He immediately looked back, saw the beige car leave the lot "fast." He also saw Bucino lying on the

sidewalk near the Club, and saw the female coming out of the Club.

Stevenson's recollection was that he and Harkness had arrived at the 602 Club about 9 p.m., and had remained there until last call, which occurred at about 11:30 p.m. He said Bucino came into the Club at 9:45 p.m. or 10 p.m. Stevenson generally corroborated Harkness's account of what happened in the parking lot, except Stevenson testified that Bucino, when he first approached the beige car, had at one point "lean[ed] over the door." He said that at first Bucino and the occupant of the car appeared to be talking calmly, but "then it looked like they may have been arguing," because Bucino "was kind of shaking his finger at the man in the car." Stevenson said Bucino then turned and walked away from the car, walking about halfway back to the door of the bar. At that point, Bucino stopped, turned around, and began walking back toward the car. Stevenson observed Bucino say something to the occupant of the car, as he approached it, but Stevenson then averted his gaze to speak to Harkness. Stevenson heard what he believed to be a shot, looked back, and saw the flashes of muzzle fire from a gun in the area of the driver's seat of the vehicle as two additional shots were fired. Stevenson testified that at the time the shots were fired, Bucino was four to five feet from the car. He said the beige car then quickly left the lot. Stevenson later identified a car belonging to the defendant's wife as the beige car from which the shots were fired.

The defendant testified that he left the bar at the same time as the white female, although they were not together. He said the shorter black male who had been in the bar with them then drove by in a white car, stopping long enough to invite the female to join him. When she refused, the male in the white car left. The defendant said that at about this time he noticed a tall white male standing by the entrance to the package store. He said the female then returned to the bar, and Sims got in his car, a black Volkswagen

"beetle", and left. He said he heard a "pop or something" as he left the parking lot, but paid no attention to it.

## II

### *The Requested Manslaughter Instruction*

At a bench conference called at the conclusion of all the evidence, the trial judge discussed with counsel the jury instructions to be given. Defendant's attorney asked for an instruction on manslaughter. He said:

> I think that the State in its evidence may have triggered the issue of manslaughter. And I would ask the court to instruct the jury and allow them to return a verdict of manslaughter if they feel that the killing of Mr. Bucino was done by my client but may have been done with mitigation.

The prosecutor assumed that the defense request was based on one of two theories: hot-blooded response to a legally adequate provocation, or imperfect self-defense. He addressed both theories, and opined that the evidence was insufficient to generate an instruction on either. Defense counsel clarified his position:

> What I'm saying, judge, I don't think this is an imperfect self-defense case at all. I think this is a case where the jury may find that because of the man's size and because of his condition as to sobriety, or lack of same, that his—he's been described as massive. He was described as intimidating.... That the jury may feel, and they are the trier of the fact, that the person responded to these gestures. And that this coming back after he had left, came back in an aggressive-type manner, to be adequate provocation. And I think it's a question for the trier of fact to determine. I think—I don't think it's necessary for my client to substantially put himself at the scene. If the State's evidence, and they're trying to show that he was a criminal agent, and if the State's evidence fairly generates the issue I think that it's up to the trier of fact to determine.

The trial judge denied the request, finding the defendant's testimony to be inconsistent with a theory of mitigation. He said:

> It may have been had he remained silent, but once he takes the stand and denies it I'm not going to allow him to walk both sides of the street which is what you want to do. The appellate court's going to have to permit that. The court will deny the motion.

The trial judge instructed the jury concerning murder in the first and second degrees but, consistent with his ruling, did not give an instruction concerning manslaughter. Although the defendant noted certain exceptions at the conclusion of the charge, he did not include an exception to the court's failure to instruct on manslaughter.

The defendant was convicted of second degree murder and sentenced to 25 years imprisonment.[2] He appealed, and the Court of Special Appeals affirmed his conviction in an unreported opinion. The intermediate appellate court, relying upon its earlier decision in *Brown v. State*, 29 Md.App. 1, 349 A.2d 359 (1975), held that where the defendant denied involvement in the shooting, the trial judge properly refused to instruct on manslaughter. We granted the defendant's petition for certiorari, and we affirm the conviction. We do so, however, on the ground that the evidence adduced at trial was not sufficient to generate the issue of manslaughter, and not on the ground that the defendant was precluded from advancing alternative or inconsistent theories of defense.

■ Preliminary to our discussion of the substantive issues, we note a potential problem with respect to adequate preservation of this point for appellate review. Maryland Rule 4–325(e) provides, in part:

> No party may assign as error the giving or the failure to give an instruction unless the party objects on the

---

2. The defendant was also found guilty of the use of a handgun in the commission of a crime of violence, and was sentenced to five years concurrent imprisonment on that charge.

record promptly *after* the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. (Emphasis added.)

We have said that under certain well-defined circumstances, when the objection is clearly made before instructions are given, and restating the objection after the instructions would obviously be a futile or useless act, we will excuse the absence of literal compliance with the requirements of the Rule. *Gore v. State,* 309 Md. 203, 208–09, 522 A.2d 1338 (1987); *Bennett v. State,* 230 Md. 562, 188 A.2d 142 (1963). We make clear, however, that these occasions represent the rare exceptions, and that the requirements of the Rule should be followed closely. Many issues and possible instructions are discussed in the usual conference that takes place between counsel and the trial judge before instructions are given. Often, after discussion, defense counsel will be persuaded that the instruction under consideration is not warranted, and will abandon the request. Unless the attorney preserves the point by proper objection after the charge, or has somehow made it crystal clear that there is an ongoing objection to the failure of the court to give the requested instruction, the objection may be lost. *See Johnson v. State,* 310 Md. 681, 685–89, 531 A.2d 675 (1987). In reading the transcript of these proceedings, for example, it is difficult, if not impossible, to determine whether defense counsel acquiesced in the judge's determination that the defendant could not "walk both sides of the street" or, whether having considered the apparent inconsistency of the two positions, counsel decided to abandon the request for a manslaughter instruction as a matter of sound trial tactics or, whether he intended to persist in his request.

We shall consider the issue notwithstanding the defendant's failure to follow the precise dictates of Rule 4–325(e) because, as the State concedes, the Court of Special Appeals apparently considered the substantive question under the "plain error" exception built into the Rule, and that Court did not abuse its discretion in doing so. *See Dawkins v. State,* 313 Md. 638, 643, 547 A.2d 1041 (1988).

■■■■ The trial judge was of the opinion that the defendant could not "walk both sides of the street"—that is, that the defendant could not simultaneously advance inconsistent theories of defense. We do not agree. We hold that a defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent. This is the position taken by the federal courts, and by the vast majority of state courts. *See, e.g., Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *People v. Perez*, 62 Cal.2d 769, 44 Cal.Rptr. 326, 401 P.2d 934 (1965); *State v. Harris*, 189 Conn. 268, 455 A.2d 342 (1983); *State v. Shehan*, 242 Kan. 127, 744 P.2d 824, 827–28 (1987); *State v. Knowles*, 495 A.2d 335 (1985), *appeal after remand*, 517 A.2d 1075 (Me.1986); *Love v. State*, 441 So.2d 1353 (Miss. 1983); *State v. Baker*, 277 S.W.2d 627 (Mo.1955); *State v. Kills Small*, 269 N.W.2d 771 (S.D.1978); *People v. Fugua*, 146 Mich.App. 133, 379 N.W.2d 396 (1985); *Booth v. State*, 679 S.W.2d 498 (Tex.App.1984).

This holding is consistent with the requirement of Maryland Rule 4–325(c) that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law...." It is also consistent with the general proposition that a defendant is entitled to an instruction on every essential question or point of law supported by evidence. *Smith v. State*, 302 Md. 175, 179, 486 A.2d 196 (1985); *Blackwell v. State*, 278 Md. 466, 477, 365 A.2d 545 (1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977). *See also Hook v. State*, 315 Md. 25, 41, 553 A.2d 233 (1989) (defendant entitled to an instruction on lesser included offense when that offense is fairly supported by the evidence).

To the extent that language of the Court of Special Appeals in *Brown v. State, supra,* 29 Md.App. at 20, 349 A.2d 359, is inconsistent with our holding today, that language is disapproved.

Although as a legal matter there is no bar to putting forth different or inconsistent theories of defense, there will

often be practical problems of proof, particularly where different theories involve proof of different mental states on the part of the defendant. Where, for example, a particular subjective belief is required, a defendant who testifies that he was not present may find it difficult or impossible to adduce evidence that will fairly support the required finding. Indeed, that is the crux of the problem facing the defendant in this case.

Sims argues that he was entitled to a manslaughter instruction on either of two theories—hot-blooded response to provocation, or imperfect self-defense. Concerning the first, he argues that the jury could have found he acted in hot blood either as a result of a mutual affray, or in direct response to provocation evidenced by Bucino's words coupled with his conduct.

In *Cox v. State*, 311 Md. 326, 331, 534 A.2d 1333 (1988), we defined voluntary manslaughter to include "intentional homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool." In *Whitehead v. State*, 9 Md.App. 7, 11, 262 A.2d 316 (1970), Judge Orth for the Court of Special Appeals set forth the four elements of the rule of provocation described by Professor Rollin M. Perkins:[3]

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act.

Mutual combat has been recognized as a possible source of adequate provocation. *Carter v. State*, 66 Md.

---

**3.** R. Perkins, *Criminal Law* 43–55 (1957). More recently, *see* R. Perkins, *Criminal Law* 53–54 (2d ed. 1969); R. Perkins and R. Boyce, *Criminal Law* 84–85 (3d ed. 1982).

App. 567, 572, 505 A.2d 545 (1986); *Shuck v. State,* 29 Md.App. 33, 38–40, 349 A.2d 378 (1975), *cert. denied,* 278 Md. 733 (1976); *Whitehead v. State, supra,* 9 Md.App. at 11, 262 A.2d 316; R. Perkins and R. Boyce, *Criminal Law* 88–91 (3d ed. 1982); 2 C. Torcia, *Wharton's Criminal Law* § 159 (14th ed. 1979). The rule of provocation will apply when persons enter into angry and unlawful combat with a mutual intent to fight and, as a result of the effect of the combat, the passion of one of the participants is suddenly elevated to the point where he resorts to the use of deadly force to kill the other solely because of an impulsive response to the passion and without time to consider the consequences of his actions. In the case before us, there was no evidence of a mutual affray. Insulting words or gestures, no matter how opprobrious, do not amount to an affray, and standing alone, do not constitute adequate provocation. *See* 2 C. Torcia, *Wharton's Criminal Law, supra,* § 156; R. Perkins and R. Boyce, *Criminal Law, supra,* 93–94; *Lang v. State,* 6 Md.App. 128, 250 A.2d 276 (1969). Although there was evidence from which the jury could have found that Bucino had directed racial and derogatory comments toward Sims in the bar, this conduct did not constitute adequate provocation. Moreover, Sims testified that he was not upset by the comments. He said:

> I didn't pay him no attention. I don't—you know, I didn't want to argue about it, right. So I just looked at him, you know, and that was it.... Me and him never really had any words, you know, about anything.

As the Court of Special Appeals noted in *Lang v. State, supra,* 6 Md.App. at 132, 250 A.2d 276, there is authority for the proposition that sufficient provocation may consist of words accompanied by conduct indicating a present intention and ability to cause the defendant bodily harm. *See* 1 *Wharton's Criminal Law and Procedure* § 177 (Anderson ed. 1957). Assuming, without deciding, that a combination of words and conduct may give rise to sufficient provocation, we find the evidence here insufficient to support that theory.

■ Even if we were to find the evidence sufficient to objectively show adequate provocation, there is not a shred of evidence showing the state of mind of the defendant at the moment of the shooting. Sims' testimony sheds no light on this because he testified that he was not there. No one else saw his facial expressions or heard his speech at the time critical to this determination. Assuming that there might be a case where evidence of that type could demonstrate the sudden onset of hot-blooded passion that produced the mortal blow or shot, this is not such a case. The blood must indeed be hot, and under some circumstances only the hot-blooded killer can attest to that. *See Price v. State,* 82 Md.App. 210, 217, 570 A.2d 887 (1990); *Cunningham v. State,* 58 Md.App. 249, 259, 473 A.2d 40 (1984); *Tripp v. State,* 36 Md.App. 459, 469, 374 A.2d 384, *cert. denied,* 281 Md. 745 (1977); *Bartram v. State,* 33 Md.App. 115, 175, 364 A.2d 1119 (1976), *aff'd,* 280 Md. 616, 374 A.2d 1144 (1977).

■ Although the ultimate burden of proving the absence of mitigation rests upon the State when that issue is properly in the case, the burden of initially producing "some evidence" on that issue (or of relying upon evidence produced by the State or adduced from witnesses called by the State) sufficient to give rise to a jury issue with respect to mitigation, is properly cast upon the defendant. *Dykes v. State,* 319 Md. 206, 215–17, 571 A.2d 1251 (1990); *Simmons v. State,* 313 Md. 33, 39–40, 542 A.2d 1258 (1988); *State v. Evans,* 278 Md. 197, 207–08, 362 A.2d 629 (1976). Sims was singularly unsuccessful in placing before the jury evidence sufficient to fairly generate the issue of mitigation by hot-blooded response to adequate provocation.

Sims fares no better with his second argument, concerning the doctrine of imperfect self-defense. He did not preserve this point for appellate review. Indeed, he expressly disavowed any reliance upon the theory of imperfect self-defense when he requested an instruction on manslaughter. We add that had the point been preserved, we would have found it to be without merit.

■ We recognized the doctrine of imperfect self-defense in *State v. Faulkner,* 301 Md. 482, 483 A.2d 759 (1984), and we have more recently discussed it in *Simmons v. State, supra,* and *Dykes v. State, supra.* Imperfect self-defense may be available to mitigate murder to manslaughter when the defendant is able to show that he honestly held certain subjective beliefs even though those beliefs may be objectively unreasonable, and all other requirements of "perfect" self-defense are present. Judge Moylan, writing for the Court of Special Appeals in *Watkins v. State,* 79 Md.App. 136, 138, 555 A.2d 1087 (1989), noted:

Where ... the defender *unreasonably* (though honestly) *perceives* the danger or *unreasonably* (though honestly) *responds* with more than necessary force, it is a case of imperfect self-defense, which mitigates the level of blameworthiness down to the manslaughter level even though it does not totally exculpate. (Emphasis in original.)

■ Sims has never contended that he was entitled to an instruction on "perfect" self-defense. He does not contend that there was evidence from which the trier of fact could conclude that the person who shot Bucino had reasonable grounds to believe himself in immediate danger of death or serious bodily harm, and that resort to the use of fatal force was justified. Rather, he contends that even in the absence of proof of an objectively reasonable belief concerning the level of danger he faced or the need to resort to fatal force, he was entitled to have the jury consider his subjective state of mind. The difficulty with that argument is that there is not a scintilla of evidence concerning the beliefs actually entertained by the person who shot Bucino. As we pointed out above, the defendant has the burden of presenting some evidence sufficient to reasonably generate the issue. The issue in this instance involved the honestly held subjective feelings of the perpetrator at the moment of the shooting. When the defendant maintains that he was not the perpetrator, this becomes a very difficult, though probably not

impossible,[4] burden to meet. In this case, the defendant did not meet that burden.

## III

### *Evidence of Victim's Prior Conduct*

Harkness, one of the two Navy men who was present at the 602 Club on the night of the shooting, testified on direct examination that he had seen Bucino at the 602 Club, and had seen him earlier in the evening, at about 5 or 6 p.m., at the Tack Room. He said, "[t]he reason he stuck in my mind was because he was a little bit rowdy at the last place I'd seen him." On cross-examination, when defense counsel began to ask about events at the Tack Room, the prosecutor objected and requested a bench conference. The trial judge instructed defense counsel to state what he intended to ask the witness concerning the earlier events, and counsel replied "I'm going to ask him if [Bucino] got thrown out." He explained that he wished thereby to show that Bucino was "drunk and intoxicated and unruly that night." The prosecutor questioned the probative value of the proposed testimony, and argued that "you [can] be drunk and unruly in one place and then nice in another." The trial judge sustained the objection.

The ruling was not error. The defendant was attempting to show that because Bucino was rowdy at one bar at 5 p.m. or 6 p.m. in the evening, it was likely that he was also rowdy later in the evening at another bar.[5] The inferential value of proof of the existence of a condition at one point in

---

4. See the discussion in *Lambert v. State*, 70 Md.App. 83, 98, 519 A.2d 1340 (1987).

5. The defendant does not argue that he was attempting to show the turbulent and dangerous nature of the victim in conjunction with a claim of self-defense. *See Williamson v. State*, 25 Md.App. 338, 345, 333 A.2d 653, *cert. denied*, 275 Md. 758 (1975). In any event, from what we have said it is clear that the defendant did not lay a proper foundation of evidence tending to show that he acted in self-defense.

time to prove its existence at a later point of time depends on a variety of circumstances.

When the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance *at a later period.*

The degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand. That a soap-bubble was in existence half-an-hour ago affords no inference at all that it is in existence now; that Mt. Everest was in existence ten years ago is strong evidence that it exists yet; whether the fact of a tree's existence a year ago will indicate its continued existence today will vary according to the nature of the tree and the conditions of life in the region. So far, then, as the *interval of time* is concerned, no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control. (Emphasis in original.)

2 *Wigmore on Evidence* § 437 (3d ed. 1940).

In *Hammond v. Inloes,* 4 Md. 138, 172 (1853), our predecessors held that "where seisen of an estate has been shown its continuance will be presumed." And, in *Stitzel v. Kurz,* 18 Md.App. 525, 538, 308 A.2d 430, *cert. denied,* 269 Md. 761 (1973), the Court of Special Appeals held that evidence concerning the condition of a road sign was properly admitted:

When it is shown that a condition existed at a certain time, and the condition is one which by its nature is relatively permanent, rather than transitory or changeable, it is rational to infer that the same condition existed before and after the time shown, for a length of time reasonably consistent with the circumstances, unless

there is evidence from which a change in the condition could reasonably be inferred.

In dealing with conditions more likely to change, however, this Court has recognized that evidence of the earlier condition may not have sufficient probative value to be admissible. In *Transit Company v. Metz*, 158 Md. 424, 453, 149 A. 4, (1930) *appeal dismissed*, 282 U.S. 801, 51 S.Ct. 40, 75 L.Ed. 720 (1929), the Court held that evidence of the manner in which a truck was driven when it passed a detour about 1,000 yards from the place of the accident was properly excluded. In *Reid v. Humphreys*, 210 Md. 178, 185, 122 A.2d 756 (1956), the Court found no error in the exclusion of evidence of the speed of a vehicle just prior to the accident, but one and one-half miles distant therefrom, saying:

> Generally, the admissibility of testimony as to the speed or reckless operation of a motor vehicle at some distance from the place where it afterwards collided with another vehicle is discretionary with the trial court, and a ruling admitting such evidence will not be disturbed on appeal in the absence of a clear abuse of discretion.

To the same effect, see *Bennett v. Bass*, 248 Md. 260, 266, 235 A.2d 715 (1967) (speed of vehicle at various points ranging from one and one-half miles to six blocks from scene of accident properly excluded).

The defendant did not proffer any facts that Harkness might have been able to add to his previous testimony that Bucino had been "a little bit rowdy." He did not proffer that Harkness had knowledge that Bucino had "been thrown out" of the Tack Room, or if so, that Harkness knew what Bucino had done that may have brought about his ejection. He did not proffer that Harkness was able to offer an opinion concerning the Bucino's sobriety when he saw him earlier. Given these circumstances, and considering the inherent impermanence of the condition that Sims sought to show by earlier conduct, we cannot say the trial judge abused his discretion in excluding the evidence.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.