700 A.2d 829

**David Michael FISCHER, Appellant,**

v.

**STATE of Maryland, Defendant.**

**No. 113, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Sept. 26, 1997.

444

Howard L. Cardin (Cardin & Gitomer, P.A., on the brief), Baltimore, for appellant.

Regina Hollins Lewis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Sandra A. O'Connor State's Attorney for Baltimore County, Towson, on the brief), for appellee.

Argued before CATHELL, DAVIS and BYRNES, JJ.

CATHELL, Judge.

David Michael Fischer was charged in the Circuit Court for Baltimore County under a five-count indictment as follows: count 1, murder; count 2, arson of a dwelling; count 3, arson of a structure; count 4, first degree burglary; and count 5, second degree burglary. Appellant was tried before a jury, and at the close of the state's case-in-chief, the court granted a motion for a judgment of acquittal as to the first degree burglary count. At the close of all the evidence, the court

granted a motion for judgment of acquittal as to the second degree burglary count. The other three counts went to the jury, and the jury found appellant not guilty of first degree murder, guilty of second degree murder, guilty of the arson of the dwelling, and guilty of arson of the structure.

After appellant's motion for a new trial was denied, he was sentenced to a thirty-year term of incarceration on the second degree murder conviction and a consecutive thirty-year term of incarceration for the conviction of arson of a dwelling. The court merged the conviction for arson of a structure into the conviction for arson of a dwelling. Appellant raises two questions for our review:

1. Did the trial court err in denying ... appellant's motion for a judgment of acquittal [on] the charge of arson of a dwelling house?

2. Did the trial court err in failing to instruct the jury:

 A) As to the definition of an accomplice, and that the testimony of an accomplice must be corroborated, and

 B) That ... appellant's prior convictions for theft and burglary could only be considered in determining ... appellant's credibility?

## FACTS

The murder victim was a fifteen year old girl who ran away from home in the late summer of 1995. On April 16, 1996, Baltimore County Police discovered her decomposed remains in a shallow grave off of River Road in Catonsville. The cause of death was determined to be a single gunshot to the head.

The State alleged that appellant killed the girl sometime during the fall of 1995 at 1125 North Rolling Road and then, with the help of Jonathan Izquierdo (Izquierdo), dumped her body near River Road in Catonsville. The State also alleged that on February 28, 1996, appellant attempted to destroy potential evidence by setting fire to the house in which the murder took place.

To establish appellant's criminal agency, the State relied primarily upon the testimony of three individuals: Izquierdo, John Tuchman (Tuchman), and Charles Walton (Walton). All three individuals knew each other for at least one year and agreed to cooperate with the police. Each of the individuals also had contact with appellant. Additionally, these three witnesses agreed to cooperate and testify against appellant, in part, because each faced significant legal problems of his own.[1]

Izquierdo testified he met appellant through a mutual friend, Khori Smith (Smith), in March of 1995. Izquierdo testified that appellant regularly carried in his waistband a nine millimeter Glock, which he first showed Izquierdo sometime prior to September of 1995.

Izquierdo also testified that in September of 1995, he accompanied appellant to an uninhabited house located at 1125 North Rolling Road because appellant wanted to "show him something." Izquierdo stated that, once inside the house, appellant opened a cabinet and removed a dead body that was wrapped in a blanket. Izquierdo did not recognize the body at that time. He told the jury that he did not know the victim, but later remembered meeting her at a party at appellant's house.

After appellant showed Izquierdo the body, Izquierdo helped him put it in the back of appellant's truck. Once in the truck, Izquierdo noticed a set of black handcuffs that belonged to appellant. Appellant and Izquierdo then drove to River Road in Catonsville and threw the body over a three foot high concrete wall. Appellant wanted to fire a shot into the dead body from his Glock, but Izquierdo talked him out of it.

---

1. Izquierdo had been identified as a potential accomplice to appellant and was charged as an accessory to the victim's murder. In exchange for his cooperation, the State agreed to dismiss the charges. Tuchman had been charged with two counts of selling crack cocaine in one case and with assault in another case. In exchange for having the drug charges dropped, Tuchman agreed to act as an informant to Baltimore County Police Detective William Ryan (Ryan). Walton was under investigation for armed robbery in Howard County and agreed to show Ryan the location of the victim's body in exchange for help in his armed robbery case.

Tuchman testified that, on January 5, 1996, he told William Ryan, a Baltimore County Police Detective, about a conversation that had taken place between him and appellant. The conversation took place sometime between November 1995 and January 1996, and concerned a girl who appellant had killed at a house on Rolling Road. Tuchman testified that appellant told him that he handcuffed the victim, choked her first with his hands and then with a board, and then broke her back.

On January 5, 1996, Tuchman took Detective Ryan to 1125 North Rolling Road to investigate. Ryan testified that the location was a very rundown, apparently abandoned house that was starting to fall apart, with broken windows, no furniture, and graffiti on all the walls and floors. Because they could not find the body, Ryan told Tuchman to become friendly with appellant in order to find out where the body was located.

On February 23, 1996, Ryan outfitted Tuchman with a body wire and recorded part of a conversation between Tuchman and Izquierdo as they drove to, and went inside, the Rolling Road house. Once inside, Izquierdo showed Tuchman the cabinet in which the body had been kept. On the morning of February 27, 1996, Ryan received a telephone call from Izquierdo. Later that afternoon Ryan commenced a search of the River Road area, but he again failed to locate the body.

Tuchman testified that at approximately 9:00 p.m. on February 27, 1996, he called Ryan and told him that appellant was going to burn down the house on Rolling Road. At Ryan's direction, Tuchman called appellant back and told him that he would help. Appellant then told Tuchman to pick him up around midnight and to bring gasoline. In the meantime, Ryan went to 1125 North Rolling Road to establish surveillance.

Just after midnight, Tuchman and Keith Sensibox (Sensibox) arrived at appellant's house driving a blue Mitsubishi. On the way to the house, the three men stopped off at a gas station where Tuchman acquired a pack of matches. After

arriving and parking near the house, Tuchman and appellant went inside while Sensibox waited outside by the car. Tuchman testified that once inside, appellant selected a room filled with carpet, piled up the carpet, and poured gasoline onto it. According to Tuchman's testimony, appellant instructed him to light the carpet. After Tuchman lit the carpet, both he and appellant left the premises and went back to the car where Sensibox was waiting. While they were proceeding to a nearby parking lot to watch the fire, the police stopped the vehicle and arrested all three of the occupants.

On April 16, 1996, Ryan and Walton went to the River Road area and recovered the body. At trial, Deputy Chief Medical Examiner Dr. Ann Dixon testified that an autopsy of the body revealed the cause of death was a single gunshot wound to the head.

At trial, appellant testified that he did not kill the victim. Appellant also testified that, on the evening of February 28, 1996, he went with Tuchman to 1125 Rolling Road, not knowing that Tuchman planned to burn down the building. The defense put on additional testimony that appellant was framed for both the murder and the arson because of a personal vendetta Tuchman, Izquierdo, and Walton had against appellant.

Appellant was convicted of second degree murder, arson of a dwelling, and arson of a structure. This timely appeal followed.

## DISCUSSION

### 1. Conviction for Arson of a Dwelling

Appellant asserts the trial court erred in denying his motion for judgment of acquittal on the charge of arson of a dwelling because the structure in question was not a dwelling. He argues there was insufficient evidence to allow the jury to render a decision that the building in question was a dwelling.

The test for sufficiency of the evidence is " 'whether, after viewing the evidence in the light most favorable to the prose-

cution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Atkinson v. State,* 331 Md. 199, 205, 627 A.2d 1019 (1993) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Appellant contends that when applying this standard to the case *sub judice,* no reasonable trier of fact could have concluded that the structure in question was a "dwelling". We disagree and shall affirm.

 Appellant's assertion revolves around the definition of a dwelling under section 5(b) of Article 27 of the Maryland Code. This section defines dwelling as "a structure, regardless of whether an individual is actually present, any portion of which has been adapted for overnight accommodation of individuals, including any kitchen, shop, barn, stable, or outhouse that is parcel to, belonging to, or adjoining the structure." Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 5(b).

The resolution of this question involves statutory construction of the term "dwelling." The cannons of statutory construction were stated by Judge Chasanow in *State v. Bricker,* 321 Md. 86, 92–93, 581 A.2d 9 (1990):

> When interpreting a statute, the starting point is the wording of the relevant provisions. If "the language in question [is] so clearly consistent with apparent purpose (and not productive of any absurd result) ... further research [is] unnecessary." *Kaczorowski v. Mayor and City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987). In the event that ambiguity clouds the precise application of the statute, the cardinal rule of statutory construction is to ascertain and effectuate legislative intent. *Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761 (1990); *Harford County v. University,* 318 Md. 525, 529, 569 A.2d 649 (1990); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988); *In re Ramont K.,* 305 Md. 482, 484, 505 A.2d 507 (1986). To perform this task, legislative intent should be gleaned first from the phrasing of the statute itself, giving the words their "ordinary and popularly understood meaning, absent a manifest contrary legislative intention." *In re Arnold M.,*

298 Md. 515, 520, 471 A.2d 313 (1984). *See also Jones,* 311 Md. at 405, 535 A.2d 471. When engaging in the interpretive process, however, the purpose, aim or policy of the legislature cannot be disregarded. *Taxiera,* 320 Md. at 480, 578 A.2d 761; *Harford County v. University,* 318 Md. at 529, 569 A.2d 649; *Kaczorowski,* 309 Md. at 513, 525 A.2d 628. Resultant conclusions are to be reasonable, logical and consistent with common sense. *Harford County v. University,* 318 Md. at 529–30, 569 A.2d 649; *Potter v. Bethesda Fire Dept.,* 309 Md. 347, 353, 524 A.2d 61 (1987). [Brackets in original.]

The term dwelling recently was defined statutorily by chapter 228 of the 1993 Maryland Laws. Prior to that time, the term dwelling was defined by the common law. We shall examine the common-law treatment of the term dwelling after we examine the language of the statute.

First degree arson is now defined as "willfully and maliciously set[ting] fire to or burn[ing] a *dwelling or occupied structure,* whether the property of the person or another." Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 6 (emphasis added). Second degree arson prohibits the burning of a *structure.* See Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 7 (emphasis added).

The term dwelling is defined in the present statute as a "structure, regardless of whether an individual is actually present, any portion of which has been adapted for overnight accommodation of individuals." Art. 27, § 5(b). The term structure is defined as

a building, other construction, vehicle, or watercraft, including:

(1) Any barn, stable, garage, pier, wharf, boathouse, and any facility attached to a pier or wharf;

(2) Any shop, storehouse, warehouse, factory, mill, house of worship, meeting house, courthouse, workhouse, school, tent, public building, or public bridge; and

(3) Any motor vehicle, aircraft, boat, ship, and railroad car.

Art. 27, § 5(e). The house in question was clearly a structure in that it was a building. In determining whether the structure was a dwelling, the critical issue is whether any portion of the house in question was "adapted for overnight accommodation." Art. 27, § 5(b).

Applying the statutory canons discussed above, we conclude that there was sufficient evidence for the jury to decide that the house in question was a dwelling house. We explain.

The touchstone of statutory construction is determining the purpose of the statute and the intent of the Legislature. The plain language of the statute now provides that a dwelling is a building that "has been adapted for overnight accommodation." Art. 27, § 5(b). This language suggests the purpose of the statute was to expand the common-law definition of dwelling that existed prior to the enactment of the statute. The term dwelling, as defined by section 5 of Article 27, would clearly include a house in which no one is actually residing at the time of the arson because a house generally is "adapted for overnight accommodation."

The committee note to the statute also lends support that the purpose and legislative intent of the statute was to broaden the definition of dwelling such that the burning of various types of structures would constitute first degree arson. The committee note provides in relevant part:

> The definition of "structure" (and necessarily of "dwelling" and "occupied structure") has been expanded to include certain vehicles and vessels where the presence of individuals is likely and the potential for loss or injury to human life from a fire is high. It is further not unusual for these vehicles and vessels to be adapted for and used as dwellings, such as the cab of a tractor-trailer and many pleasure boats. The Committee felt that it was appropriate that these items be afforded the same protections as the more traditional dwellings.

Art. 27, § 5 committee note. Although the committee note specifically refers to structures such as boats and vehicles, it is clear the purpose of defining the terms dwelling, structure,

and occupied structure was to punish more severely arson to structures "where the presence of individuals is likely and the potential for loss or injury to human life from a fire is high." Art. 27, § 5 committee note.

An examination of the case law prior to the enactment of the 1993 statute also affirms our conclusion that the purpose and legislative intent was to broaden the scope of the types of structures that constitute dwellings. Prior to the enactment of the 1993 statute, arson was defined as follows:

> Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, or any kitchen, shop, barn, stable or other outhouse that is parcel thereof ... shall be guilty of arson....

Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 6. In a thorough opinion tracing the history of Maryland's arson statute, Judge Karwacki, in *Richmond v. State*, 326 Md. 257, 263–65, 604 A.2d 483 (1992), noted:

> The language of Art. 27, § 6 prohibiting the burning of a "dwelling house," however, which was adopted from the common law, has not been varied.
>
> ....
>
> Generally, a structure which qualifies as a dwelling house for the purpose of burglary also qualifies as a dwelling house for the purpose of arson.

In *Kanaras v. State*, 54 Md.App. 568, 460 A.2d 61 (1983), we examined the common law as to whether a vehicle known as a Shasta, a mini-motor home, constituted a dwelling house for purposes of the arson statute. The Shasta was twenty-two feet in length and self-propelled. Following a discussion of foreign state case law regarding whether vehicles could be considered dwelling houses, we stated:

> *The test in this jurisdiction as to whether a particular place is a dwelling house is whether it is used regularly as a place to sleep. Poff v. State*, 4 Md.App. 186, 189, 241 A.2d 898 (1968). There must be more than sleeping at the location on rare occasions or taking an occasional nap there.

*Id.; Herbert v. State,* 31 Md.App. 48, 51, 354 A.2d 449 (1976). The use of the word "house" in the statute does not require a permanent structure so long as persons intend to live in the structure and in fact use it as an abode for human habitation.

*Kanaras,* 54 Md.App. at 585, 460 A.2d 61 (emphasis added). We ultimately concluded that "sufficient evidence [was] produced at trial to enable a rational trier of the fact to find that the mini-motor home was a dwelling house." *Id.* (citation omitted).

This brief examination of the definition of dwelling house as used prior to the enactment of the 1993 statute indicates that one of the purposes of the new statute was to broaden the common-law definition of the term *dwelling.* We presume that had the Legislature intended to retain the common law definition, it would have defined a dwelling as a structure which is regularly used as a place to sleep. It did not do so.

The plain language of the statute, the committee note, and the comparison of the statutory language with the common law definition of dwelling lead us to conclude that the Legislature, in defining the term dwelling, intended to include within the definition of dwelling any structure, regardless of whether persons regularly utilize it as a place to sleep, so long as "it has been adapted for overnight accommodation of individuals." The Legislature's concerns for structures in which the presence of individuals is likely and the potential for loss or injury to human life from a fire is high also lead us to this conclusion.

Moreover, we note that the new statutory definition—"a structure ... adapted for overnight accommodation"—when contrasted with the prior definition—a structure "used regularly as a place to sleep"—appears to have enlarged the scope of "dwelling" from a place actually being used for sleeping purposes to a structure designed and constructed to be, or adapted to be, used for sleeping purposes. The ambit of the statute is broad enough to include the numerous structures in Maryland which, although paid little attention to by their

owners, are in various states of disrepair, or have been vandalized, nonetheless are designed for overnight habitation.

We are not, in our appellate capacity, totally removed from the real world. We are aware of the propensity of the homeless, and others, to seek shelter in structures that are not considered to be in first class condition and/or are not closely supervised or managed. There appears to be, considering numerous reported instances, a real need to afford to such persons, and to the neighbors of such structures, the protection afforded by their inclusion in the scope of the statute.

■ The determination of whether a structure constitutes a dwelling will depend to some extent on the facts and circumstances of each case. In this case, there was sufficient evidence for the jury to conclude the house in question was a dwelling. We shall examine that evidence.

Dr. Dajhit Sawehney testified that he owned the house in question at 1125 North Rolling Road and had rented out the property since approximately 1986. Dr. Sawehney testified that when the arson occurred, no one lived in, or had permission to be in, the house. He testified, in relevant part, as follows:

Q: And do you own a house at 1125 North Rolling Road?

A: I do.

Q: When did you purchase that house?

A: Somewhere in '86.

Q: Between 1986 and 1995, what did you do with the house?

A: Mostly it was used as a rental property.

. . . .

Q: Dr. Sawehney, did anyone live in the house around the end of February of 1996?

A: Nobody had permission at least from me to live there.

Q: When was the last time someone had lived there with your permission?

A: The last time was May '95. Mr. and Ms. Bell lived there and they moved on July 31st of '95. After that, the house was locked.

. . . .

Q: What, if anything, did you do with the house between July of 1995 and February of 1996?

A: In July of '95 the house was fully locked and we would just go there in the spring time. My landscaper would cut the grass, take care of the house, and the management person was probably keeping an eye on it.

On cross-examination, Dr. Sawehney testified:

Q: . . . You did not see the house in July of '95 after the tenants had moved out until September?

A: I didn't.

Q: You did not?

A: No.

. . . .

Q: Did you go into the house in September of 1995?

A: Yes, I did.

. . . .

Q: Was there any other damage to the house that you noted when you were there in September of 1995 on the inside?

A: No. It was basically as it was in May of '95.

Q: Did you go back in October of '95?

A: I went there between September to February, March maybe twice. I don't remember which months.

On redirect examination, the witness testified that he had gone to the house once in September because there had been a water leak in the basement. He stated that at that time, the electricity was turned on and the damage to the basement was cleaned. Dr. Sawehney further testified that he went to the house once between September and December. At that time, he attempted to have the heat changed from electric to gas.

The testimony of Dr. Sawehney indicated that the house was in relatively good condition at the time of the arson. Additionally, the house apparently had both water and electricity at that time. The testimony, under these circumstances, was sufficient for the jury to conclude that the house in question was adapted for overnight accommodation.[2] Accordingly, appellant properly was convicted of arson of a dwelling pursuant to section 6, Article 27 of the Maryland Code.

## 2. Jury Instructions

Appellant asserts that the trial court erred in failing to give certain instructions to the jury. His first assertion of trial court error concerns the testimony of Izquierdo and Tuchman. Appellant argues the trial court failed to instruct the jury that the testimony of these two persons, whom appellant alleges were accomplices, needed to be corroborated. Appellant's second assertion of error with respect to the jury instructions pertains to the evidence introduced by the State concerning his prior convictions. He argues the court failed "to instruct the jury that it could only consider [his] prior convictions for impeachment, not in determining whether or not he committed the offenses with which he was charged." We shall examine appellant's contentions separately.

### A. Instruction Regarding Accomplice Testimony

■ Prior to instructing the court, the following colloquy took place:

---

**2.** With respect to the term dwelling, the trial court instructed the jury as follows:

> For purposes of the arson charge, you are instructed that a dwelling means a place where people regularly sleep and includes a structure, regardless of whether an individual is actually present, any portion of which has been adapted for overnight accommodation of individuals.

The inconsistency as to this instruction was noticed by the jury. In a jury note, the jury asked "An *abandoned* home is adapted for overnight use, but is certainly not where people 'regularly' sleep. Which part of the definition is most important?" Such an observation supports the position of those of us who have, with great frequency and appreciation, seen the commendable services regularly performed by Maryland juries.

Counsel, consistent with the instructions in chambers, after instructions I'll ask counsel if you want to approach the bench. If either of you say yes, then both of you come up. If both of you say no, then we're going to go right into closing argument. Is that agreeable with the State?

[STATE'S ATTORNEY]: Agreeable with the State.

THE COURT: Is that agreeable with the defense?

[DEFENSE COUNSEL]: It is, Your Honor.

After the trial court gave its instructions to the jury, the trial judge asked counsel if they wished to approach the bench. The following then ensued:

[DEFENSE COUNSEL]: It is not something that we talked about. At the very end you said they would be returning verdicts on three out of the four counts. If they want to find him not guilty, they are going to return verdicts on four counts. Other than that, I have no exceptions.

THE COURT: Okay. I will straighten that out.

. . . .

THE COURT: Obviously, ladies and gentlemen, I was trying to explain the first and second degree murder. My conduct is not intended in any way as an influence. You will return verdicts on all four depending upon how you answer them. . . .

Is that satisfactory, counsel?

[DEFENSE COUNSEL]: Yes. Thank you, Your Honor.

A review of the record in this case indicates that appellant failed to request a jury instruction regarding the testimony of the alleged accomplices.[3] Appellant's requested jury instructions included the following: 1) witness promised leniency, 2) burglary—common law, 3) burglary—statutory, 4) arson—dwelling house, 5) arson—realty, 6) entrapment, 7) informer's testimony, and 8) credibility of witnesses.

---

**3.** An instruction regarding the testimony of an accomplice may be found in section 3:11 of *Maryland Criminal Pattern jury Instructions* (1991).

We also note that, as is evident from the above excerpts from the transcript, appellant never objected to the trial court's failure to instruct the jury with respect to corroboration or the testimony of Izquierdo and Tuchman. Maryland Rule 4–325(c) provides that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." This rule further provides: "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Md. Rule 4–325(e).

We stated in *Parker v. State*, 4 Md.App. 62, 67, 241 A.2d 185 (1968), *cert. denied*, 402 U.S. 984, 91 S.Ct. 1670, 29 L.Ed.2d 150 (1971), with respect to a predecessor rule to Maryland Rule 4–325, that

[o]rdinarily, where no objection is made to the court's instructions, a contention that there was error therein is not reviewable on appeal. The reason for the rule requiring objection as a prerequisite to appellate review is a salutary one, being designed to afford the trial judge an opportunity to correct inadvertent omissions or inaccuracies in his instructions, where the alleged error is one that might have been readily corrected if it had been called to the trial judge's attention.

We added in *Vernon v. State*, 12 Md.App. 157, 163, 277 A.2d 635 (1971):

It is clear that the purpose and design of the rule is to correct errors while the opportunity to correct them still exists. Only thus is an error preserved for appellate review.

It is *not* the purpose and design of the rule to provide an avenue for a party to lay away ammunition in the arsenal of appeal.

*See also Sims v. State*, 319 Md. 540, 548–49, 573 A.2d 1317 (1990) (noting that an objection made before instructions are given generally is insufficient to preserve for appellate review

unless counsel objects after instructions are given); *Johnson v. State,* 310 Md. 681, 686, 531 A.2d 675 (1987) ("Although the trial court's failure to give a requested instruction may constitute error, the rules go on to indicate that such error is ordinarily not preserved for appellate review unless the requesting party objects after the trial court instructs the jury.").

It is clear appellant failed to object to the trial court's failure to give an instruction regarding accomplice testimony. Accordingly, this issue has not been preserved for appellate review.

■ We may, however, pursuant to Maryland Rule 4–325(e), take cognizance of plain error at the suggestion of a party or on our own initiative. We decline to do so under the circumstances of this case. "Nothing persuades us, in the exercise of our discretion, to take the extraordinary step of overlooking the appellant's procedural failure." *Austin v. State,* 90 Md.App. 254, 261, 600 A.2d 1142 (1992).

### B. Appellant's Prior Convictions

■ Appellant argues the trial court erred in failing to give a limiting instruction that his prior convictions could be used only for purposes of impeachment. Maryland Rule 5–609(a) provides that certain criminal convictions may be used "[f]or the purpose of attacking the credibility of a witness."

In *Whitehead v. State,* 54 Md.App. 428, 430, 458 A.2d 905 (1983), a case written prior to the adoption of the Maryland rules of evidence, we stated:

As a general rule, and subject to certain exceptions, the fact that a witness, including a criminal defendant, has previously been convicted of a crime is admissible in evidence, if at all, only on the issue of the witness's credibility. When evidence of conviction of a prior crime is admissible on the issue of credibility, what is admissible is normally limited to the fact of the former conviction, as opposed to details about the commission of the earlier crime. When a former conviction is admitted for the purpose of impeach-

ment, the party against whom it is admitted is generally entitled to a limiting or cautionary instruction, advising the jury that the evidence may only be considered on the issue of credibility, and not as tending to prove guilt of the crime which is the subject of the pending case. [Citations omitted].

Pursuant to Maryland Rule 4–325(a), the trial court is required to give instructions to the jury after all the evidence has been presented and before closing arguments are given. As we indicated above, however, in order to preserve, for purposes of an appeal, the failure to give a jury instruction, a party must object promptly after the trial court gives the instructions to the jury. Appellant failed to do so in this case. Accordingly, we need not consider appellant's contention. Additionally, we decline to find plain error.

**JUDGMENTS AFFIRMED; APPELLANT TO PAY COSTS.**