2004-NMCA-109

97 P.3d 620

**Cary BATTISHILL, Plaintiff–Appellant,**

v.

**FARMERS ALLIANCE INSURANCE COMPANY, Defendant–Appellee.**

**No. 24,196.**

Court of Appeals of New Mexico.

June 29, 2004.

Certiorari Granted, No. 28,812, Aug. 23, 2004.

James E. Templeman, Templeman and Crutchfield, Lovington, NM, for Appellant.

Lee M. Rogers, Jr., Cord D. Borner, Atwood, Malone, Turner & Sabin, P.A., Roswell, NM, for Appellee.

## OPINION

SUTIN, Judge.

{1} Our task in this appeal is to interpret words in an insurance policy coverage exclusion. Plaintiff Cary Battishill sustained damage to his vacant rental house caused by arson and sued his insurer, Farmers Alliance Insurance Company, after Farmers denied coverage based on its reading of the vacant-dwelling/vandalism exclusion in its insurance policy. The district court entered summary judgment against Plaintiff, from which Plaintiff appeals. We reverse.

## BACKGROUND

{2} The facts are not in dispute. After his rental home (the dwelling) sustained fire damage, Plaintiff filed a claim under his "Homeowner's" Farmers' insurance policy (the policy). The fire was intentionally caused. The fire department investigation determined there were three distinct fires and points of origin, an odor consistent with fire accelerants in each bedroom, a partially burned towel displaying possible accelerant residue, and three "pour patterns" on the carpet. Laboratory tests confirmed the presence of gasoline on samples of debris from the house. The dwelling was vacant more than thirty days when the fire occurred. Farmers denied coverage based on an exclusion in the policy for damage to the dwelling due to vandalism and malicious mischief occurring when the dwelling had been vacant for more than thirty days prior to the fire (the exclusion). The district court upheld Farmers' denial of coverage. Plaintiff's single point on appeal is that the court erred in not interpreting the exclusion in his favor.

{3} Both parties refer to the policy as a "hybrid policy," that is, a policy providing all-risk insurance coverage on the dwelling, but named-perils insurance coverage on personal property in the dwelling. The coverage applicable to the dwelling insured against all risks except those specifically excluded. The coverage applicable to personal property in the dwelling was limited to specifically named perils.

{4} More specifically, as to the dwelling, the policy insures against direct physical loss, but excludes loss caused by "[v]andalism and malicious mischief if the dwelling has been vacant for more than 30 consecutive days immediately before the loss." Neither the all-risk dwelling coverage nor the exclusion mentions "fire." As to personal property, the policy insures direct physical loss caused by, among many other things, the named perils of "[v]andalism or malicious mischief" and also by "[f]ire or lightning." This personal property named-perils coverage also includes, among other perils, loss caused by explosion, riot or civil commotion, aircraft, vehicles, and volcanic eruption. In addition, the policy contains additional coverages, listing several specific coverages including one for loss to furnishings in rental property caused by specific perils, among which are fire or lightning, explosion, riot or civil commotion, aircraft, vehicles, and vandalism or malicious mischief. None of the coverages mentions "arson."

## DISCUSSION

### Standard of Review

{5} The issue is purely one of insurance policy language interpretation. Our review is de novo. *State Farm Mut. Auto. Ins. Co. v. Baldonado*, 2003–NMCA–096, ¶ 10, 134 N.M. 197, 75 P.3d 413.

### The Parties' Contentions and Supporting Cases

{6} Plaintiff contends that the exclusion should not be construed to include arson and that the policy, when read as a whole, is ambiguous and the exclusion should be read in his favor. Defendant contends that the dictionary definition of vandalism includes arson and that the policy is not ambiguous, so there is nothing to construe. Both parties rely on cases that are supportive of their contentions.

{7} Plaintiff relies on several cases that may be viewed as supporting his contentions. *See United Capital Corp. v. Travelers Indemnity Co.,* 237 F.Supp.2d 270 (E.D.N.Y. 2002); *Nationwide Mutual Fire Ins. Co. v. Nationwide Furniture, Inc.,* 932 F.Supp. 655 (E.D.Pa.1996); *MDW Enterprises, Inc. v. CNA Ins. Co.,* 4 A.D.3d 338, 772 N.Y.S.2d 79 (2004). These cases determined that an ambiguity existed in regard to the use of "vandalism," requiring an interpretation of the policy favorable to the insured.

{8} Farmers relies on several cases that uphold the vacant-dwelling/vandalism exclusion, several of which primarily rely on *Webster's Third New International Dictionary* (1986) [hereinafter *Webster's Third*] definition of vandalism as "'willful or malicious destruction or defacement of things of beauty or of public or private property.'" *See Am. Mut. Fire Ins. Co. v. Durrence,* 872 F.2d 378, 379 (11th Cir.1989); *Potomac Ins. Co. v. NCUA,* No. 96 C 1044, 1996 WL 396100, \*\*4–5 (N.D.Ill. Jul.12, 1996) (mem. and order); *Estes v. St. Paul Fire & Marine Ins. Co.,* 45 F.Supp.2d 1227, 1229 (D.Kan.1999); *Gov't Employees Ins. Co. v. Medley,* No. CIV.A. 96–0964–R, 1998 WL 320392, \*2 (W.D.Va. Jan.14, 1998) (final order and mem.); *Frazier v. State Farm Fire & Cas. Co.,* 957 F.Supp. 816, 818 (W.D.Va.1997).

{9} Plaintiff and Farmers both rely on *Costabile v. Metropolitan Property and Casualty Insurance Co.,* 193 F.Supp.2d 465 (D.Conn.2002), to support their respective positions. In analyzing a hybrid policy similar to that at issue in the present case, the court in *Costabile* discussed cases on which Plaintiff and Farmers rely and concluded:

[t]he parties ... have pointed to no authority—and the Court is aware of none—that addresses the question whether arson is appropriately considered an act of vandalism where ... the policy at issue is a hybrid that contains both all-risk and named perils coverage in separate and distinct coverage sections insuring separate and distinct property.

*Id.* at 475. Like the Farmers' policy in the present case, the policy in *Costabile* contained a vacant-dwelling/vandalism exclusion, and the named-perils personal property coverage covered loss from fire and also covered loss from vandalism or malicious mischief. *Id.* at 474. However, unlike the Farmers' policy, the *Costabile* policy's named-perils coverage did not apply if the dwelling was vacant. *Id.* The court turned to the *Webster's Third* definition of vandalism and held that the weight of authority required the conclusion that an incendiary fire was included with the plain and ordinary meaning of vandalism in the vacant-dwelling/vandalism exclusion under all-risk dwelling coverage. *Costabile,* 193 F.Supp.2d at 477–78. However, at the same time, the court determined as to the named-perils personal property coverage that "[b]ecause fire and vandalism are listed ... as separate causes of loss, ... it is ambiguous whether the word 'vandalism' is ambiguous as used [in] that ... coverage." *Id.* at 476. The court construed this ambiguity against the insurer, concluding that the vacant-dwelling/vandalism exclusion did not apply to the personal property coverage because it was "ambiguous in that section whether vandalism includes an incendiary fire." *Id.*

{10} We have reviewed all of the cases on which the parties rely and we are not persuaded that any of them point to a clear and compelling result one way or the other in this case. Instead, it is our sense that the word "vandalism" suggests more what Plaintiff believes it suggests to a reasonable insured. Our sense is supported by established New Mexico case law and a less superficial delving into the dictionary definitions than the case law has yet to undertake. We therefore turn to what we believe is the proper interpretation.

### Interpretation of Insurance Policy Words

{11} In interpreting insurance policy wording, we are guided by several rules. "[W]hen a word is not defined in the insurance policy, it must be interpreted in its usual, ordinary and popular sense." *Estate of Galloway v. Guaranty Income Life Ins. Co.*, 104 N.M. 627, 628, 725 P.2d 827, 828 (1986); *Grisham*, 1999–NMCA–153, ¶ 8, 128 N.M. 340, 992 P.2d 891 ("Undefined words in an insurance policy are given their plain and ordinary meaning if that can reasonably be ascertained."). Thus, an insurance policy is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense. *Vihstadt*, 103 N.M. at 466, 709 P.2d at 188. We interpret the words and terms of an insurance contract in their usual and ordinary sense, unless a different meaning is required. *See Atlas Assur. Co. v. Gen. Builders, Inc.*, 93 N.M. 398, 400, 600 P.2d 850, 852 (Ct.App.1979).

{12} The general rule is that exclusionary clauses in insurance contracts are to be construed narrowly. *See Knowles v. United Servs. Auto. Ass'n*, 113 N.M. 703, 705, 832 P.2d 394, 396 (1992). "It is the obligation of the insurer to draft an exclusion that clearly and unambiguously excludes coverage." *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 2002–NMCA–054, ¶ 7, 132 N.M. 264, 46 P.3d 1264. However, the general rule "cannot be utilized to override the clear and unambiguous terms of an exclusion." *Grisham*, 1999–NMCA–153, ¶ 13, 128 N.M. 340, 992 P.2d 891. "[E]xclusionary definitions in an insurance contract are to be enforced so long as their meanings are clear and they do not conflict with the statutory law." *Safeco Ins. Co. v. McKenna*, 90 N.M. 516, 518, 565 P.2d 1033, 1035 (1977). "In construing standardized policy language, our focus must be upon the objective expectations the language of the policy would create in the mind of a hypothetical reasonable insured, who, we assume, will have limited knowledge of insurance law." *Computer Corner*, 2002–NMCA–054, ¶ 7, 132 N.M. 264, 46 P.3d 1264. "If we are alerted to an interpretation supporting coverage to which the language of the policy is reasonably susceptible and which does not violate public policy, we generally will construe the provision against the insurer and in favor of coverage." *Id.* "It is then up to the insurer to revise the provision in question so as to render an insured's expectation of coverage unreasonable." *Id.* The insurer has the burden of proof to prove no coverage under an all-risk policy. *See Holmes's Appleman on Insurance, 2d* § 1.10, at 45–46 (1996) (stating this to be "the American rule" in all states except Texas).

### The Word "Vandalism"

{13} We agree with Farmers that, in this case, to understand the common and ordinary meaning of vandalism we need to turn to dictionary usage. We do not, however, think that the search for meaning should end with the very broad definition that Farmers and the cases it cites rely on. Quite apart from the dictionary, there exists a sense that the common and ordinary meaning of vandalism is something different than that of arson. *See MDW Enters.*, 772 N.Y.S.2d at 83 (stating that "ordinary business people generally view 'vandalism' and 'arson' as distinct perils"). Upon research deeper than that shown by Farmers, it became rather clear that the very general and very broad definition of vandalism set out by Farmers and its supportive cases was derived from little more than a shallow examination of meaning. At the very least, our study leads us to conclude that there exists no one common and ordinary meaning.

{14} The critical words in this appeal are "vandalism," "fire," and "arson." The word vandalism does not appear in the all-risk dwelling coverage; it appears only in the exclusion of the all-risk dwelling coverage. The words fire and arson do not appear anywhere in the all-risk dwelling coverage section of the policy. Reading the coverage portion of the all-risk dwelling coverage section, a reasonable insured will understand that destruction of the dwelling from an intentionally set fire, that is from arson, is covered. An insured is then met with the exclusion for vandalism to the otherwise covered, vacant dwelling, and Farmers' denial of

a claim for loss based on the exclusion. Farmers contends that the broad *Webster's Third* definition of vandalism is the common and ordinary meaning and necessarily covers arson and controls. We do not believe this is correct in the context of dwelling insurance, purchased to insure against the dreaded risk of fire. We conclude that to the ordinary and reasonable homeowner who purchases insurance to protect against destruction of a residential dwelling from fire, including arson, vandalism means something much different from arson.

{15} Delving deeper than Farmers into definition and meaning, our study first shows that "vandalism" stems from the word "vandal." "Vandals" were a Germanic people that, among other things, entered Italy, sacked Rome, and destroyed many monuments of art and literature. *Webster's Third* 2532. A vandal is "one who willfully destroys or mars something beautiful (as a work of art)," and also as "a wanton or ignorant destroyer or defacer of a building or monument that should be preserved." *Id. Black's Law Dictionary* shows "vandal" as originating from "a member of the Germanic tribe known as Vandals," and defines the term to mean "[a] malicious destroyer or defacer of works of art, monuments, buildings, and other types of property." *Black's Law Dictionary* 1550 (7th ed. 1999). A look at the *Longman Dictionary of American English* 741 (1983) [hereinafter *Longman*] shows "vandal" as meaning "a person who intentionally damages or destroys beautiful or useful things." The *Cambridge International Dictionary of English* 1606 (1996) describes a vandal as "a person, often in a group, who, esp. when they are drunk or out of control, damages property belonging to other people • *Vandals daubed the building with slogans in thick yellow paint.* • *Vandals looted stores, smashed windows, hurled bottles, overturned cars and uprooted trees in the downtown shopping district.*" Ralph De Sola's *Crime Dictionary* 167 (rev. and expanded ed. 1988) shows a vandal as a "person, usually juvenile, who ignorantly, maliciously or willfully defaces, destroys or mutilates private or public property; name derived from the Vandals, a fifth-century Germanic tribe of Aryan–Christian Huns who ravaged much of France, Spain and North Africa before sacking Rome in 455 A.D."

{16} "Vandalism," then, is reasonably considered "[t]he spirit or conduct of the Vandals; ferocious cruelty; hostility to the arts and literature, or willful destruction or defacement of their monuments," and synonymous with hooliganism and malicious mischief. At http://dictionary.reference.com (citing *Webster's Revised Unabridged Dictionary* (1996) (1998 MICRA, Inc.) and WordNet 1.6 (1997) Princeton University). As Farmers points out, even *Webster's Third* defines "vandalism" as "willful or malicious destruction or *defacement of things of beauty* or of public or private property," *Webster's Third* 2532 (emphasis added), which indicates that the common, ordinary meaning could be something other than the mere willful or malicious destruction of a private building. *Black's Law Dictionary* defines "vandalism" as "[w]illful or ignorant destruction of public or private property, esp. of artistic, architectural, or literary treasures"[;] "[t]he actions or attitudes of one who maliciously or ignorantly destroys or disfigures public or private property; active hostility to anything that is venerable or beautiful." *Black's Law Dictionary* 1550. *Longman* defines "vandalism" as "intentional, needless, and usu. widespread damage and destruction, esp. of public property." *Longman* 741. Further definitions and sources indicate: "[D]efacement, destruction or mutilation of private and public property; littering; out-of-season hunting; willful destruction of artistic or literary treasures." *De Sola* 167. Also, "[t]he conduct or spirit characteristic of, or attributed to, the Vandals in respect of culture; ruthless destruction or spoiling of anything beautiful or venerable; in weakened sense, barbarous, ignorant, or inartistic treatment." 2 *The Compact Edition of the Oxford English Dictionary* 35 (1971). It does not escape our study that one category in which *Roget's International Thesaurus* places "vandalism" is that of "vulgarity." *Roget's International Thesaurus* 581–82 (1951).

{17} The foregoing study indicates to us that a reasonable denotation as well as a reasonable connotation of what is a vandal and of what vandalism consists is that these words pertain more to what we think of as malicious or uncaring defacement (of, e.g., walls or floors or vehicles by, e.g., paint or scratch), breaking (of, e.g., windows or artifacts), slitting (of, e.g., tires or curtains), bashing (of, e.g., mailboxes or headlights or furniture, with, e.g., a baseball bat), and tearing out (of, e.g., fixtures or wires) or other similar senseless, delinquent, and juvenile-like behavior. It indicates a type of behavior primarily directed at property having artistic, historical, architectural, literary, musical, personal or emotional significance or value. While vandalism can also be read to generally and broadly mean willful or malicious destruction of a dwelling, its common and ordinary meaning is not necessarily or only defined that way.

{18} We, in fact, see nothing that requires the conclusion, even through the logic employed by Farmers and the cases it cites, that the common and ordinary meaning of vandalism necessarily denotes and connotes the arsonist act of a person whose purpose is focused on burning down a residential dwelling. In the present case, although the parties believe an arsonist set the fire, the authorities did not find the arsonist. Nothing about the circumstances in this case indicate that a "vandal" was at work in the senses we describe earlier in this opinion.

{19} We do not find this more thorough analysis of the definitions of "vandal" and "vandalism" or our conclusion to be a strained one. See McKenna, 90 N.M. at 520, 565 P.2d at 1037 ("Resort will not be made to a strained construction for the purpose of creating an ambiguity when no ambiguity in fact exists."). Rather, this study of meanings of "vandal" and "vandalism" has led us relatively unlaboriously to a view that is, we think, consistent with how many, if not most, ordinary citizens and reasonable insureds approach the meaning of vandalism. That approach is to think of arsonists and vandals, and arson and vandalism, as distinct actors and acts.

{20} The distinctions become more clear when we consider the definition of arson. Webster's Third defines "arson" as "the willful and malicious burning of or attempt to burn any building, structure, or property of another (as a house, a church, or a boat) or of one's own usu. with criminal or fraudulent intent." Webster's Third 122. Black's Law Dictionary states that the common law meaning of arson is "the malicious burning of someone else's dwelling house." Black's Law Dictionary 106. This Court has stated common law arson to be "the wilful and malicious burning of the dwelling house of another [and] an offense against the security of habitation or occupancy, rather than against ownership or property." In re Gabriel M., 2002–NMCA–047, ¶ 13, 132 N.M. 124, 45 P.3d 64 (internal quotation marks and citations omitted). We have held that the act of lighting fire to merchandise in a department store without damaging the physical structure of the store was not statutory arson. Id. ¶ 21.

{21} An exclusion based on the undefined word "vandalism" and argued by an insurer to carry as its common and ordinary meaning the very broad definition of "intentional destruction of private property" with no consideration of the impact the root of the word and meaning may have on the ordinary homeowner does not, in our view, require the conclusion that a reasonable insured must understand the word to mean and include arson. Rather, to a reasonable insured, the desire to have fire coverage, unquestionably extremely important for an insured, predominates. Common vandalism coverage, while important, is likely to be of less concern. To that homeowner, vandalism in a dwelling left vacant for thirty days is more likely to mean damage that is not devastating, but rather to mean damage from someone breaking windows, breaking in to see what is inside, and/or to do indiscriminate damage by defacing walls, pulling fixtures out, scarring floors, bashing artifacts, harming items of art or priceless objects, and similar types of behavior, not intentionally setting the dwelling ablaze for its total or very substantial destruction. We think it reasonable to conclude that ordinary homeowners who purchase all-risk fire and casualty insurance to

cover, among other things, destruction of their dwelling house from fire, be it unintentionally caused or from arson, will not look at a vacancy exclusion for "vandalism and malicious mischief" as meaning there is no coverage for destruction of the dwelling from arson, particularly where they understand their all-risk coverage to be for fire, including arson.

{22} In conclusion, for the purpose of the issue we address, we treat malicious mischief to be little different than vandalism, and we determine that these terms have denotations and connotations different than arson. We construe the exclusion against Farmers and in favor of coverage. *See Computer Corner,* 2002–NMCA–054, ¶ 7, 132 N.M. 264, 46 P.3d 1264; *see also Knowles,* 113 N.M. at 705, 832 P.2d at 396 (reiterating the rules that (1) exclusionary clauses are to be narrowly construed; (2) the clause is ambiguous if it is reasonably and fairly susceptible of different constructions; and (3) the ambiguous clause is to be construed against the insurer). We therefore conclude that the vacant-dwelling/vandalism exclusion does not apply to destruction of a covered but vacant dwelling caused by arson.

### The Whole Policy Ambiguity Issue

{23} The all-risk and named-perils personal property coverages are clearly separate coverages with likely different underwriting analysis based on different risks. Yet, the parallel coverages for fire, including arson, and for vandalism and malicious mischief, can very well create a question in the mind of a reasonable insured. More specifically, the listing of "fire" and also "vandalism or malicious mischief" as named and covered perils does raise a question as to why "fire," which can mean an intentionally set fire, or arson, and vandalism or malicious mischief, which can mean, according to Farmers, intentionally setting a fire or arson, are both listed without any limitations or explanations. The question is magnified by the concurrent coverage of fire and arson in the all-risk coverage with only vandalism and malicious mischief excluded and then only if the dwelling is vacant.

{24} A reasonable insured could then observe a parallel structure in the policy: (1) Under the all-risk coverage, fire, which can mean an intentionally set fire, or arson, is covered, and vandalism is also covered, except that vandalism is not covered if the dwelling is vacant; (2) Under the named-perils personal property coverage, fire, which can mean an intentionally set fire, or arson, is covered, and vandalism is covered whether or not the dwelling is vacant. Since loss from fire is covered under both coverages, whether or not the fire is due to arson, a reasonable insured could draw the conclusion that vandalism is not also intended to mean loss from fire. Further, looking at the parallel coverages, a typical insured could reasonably think that destruction of personal property from vandalism was a reckoning quite different from destruction of personal property as a by-product of the destruction of a dwelling by arson. Thus, even though the all-risk dwelling coverage and the named-perils personal property coverage are distinct coverages, their structure permits an interpretation supporting all-risk dwelling coverage for vacant dwelling destruction from arson.

### CONCLUSION

{25} Based on the existence of a common and ordinary meaning of "vandalism" and thus an interpretation of "vandalism" that supports coverage, on a narrow construction of the exclusion, and also looking at the structural similarities of the separate coverages in the insurance policy, we determine that a reasonable insured would read the policy as covering destruction by arson of the vacant, otherwise covered, dwelling. We therefore hold that the vacant-dwelling/vandalism exclusion does not exclude coverage for the dwelling loss caused by arson. We reverse the summary judgment entered by the district court.

{26} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL E. VIGIL, Judges.