872 A.2d 110

## MUTUAL FIRE INSURANCE COMPANY OF CALVERT COUNTY

v.

### Corwin L. ACKERMAN, Personal Representative of the Estate of Phyllis Morss, et al.

No. 2565, Sept. Term, 2003.

Court of Special Appeals of Maryland.

April 13, 2005.

2

George E. Reede, Jr. (Lisa B. Capitos, on brief), Baltimore, for appellant.

Walter W. Sawyer, III, Baltimore, for appellee.

Panel MURPHY, C.J., ADKINS, BISHOP, JOHN J., JR. (Retired, Specially Assigned) JJ.

ADKINS, J.

Appellant Mutual Fire Insurance Company of Calvert County ("Mutual Fire") challenges the summary judgment granted by the Circuit Court for St. Mary's County in favor of appellee Michael O'Brien. The circuit court judgment required that an insurance policy issued by Mutual Fire cover losses sustained as the result of a fire damaging a house identified as "the dwelling" on real property owned by O'Brien. Mutual Fire raises two issues on appeal:

I. **Did the circuit court err in finding that the house on the property was used principally for dwelling purposes within the meaning of the insurance policy?**

II. **Did the circuit court err in finding that the vandalism exclusion in the dwelling section of the insurance policy did not operate to exclude coverage for damage caused by arson?**

For the reasons explained below, we shall vacate the summary judgment and remand the case for further proceedings.

## FACTS AND LEGAL PROCEEDINGS

Phyllis Morss, and then later her estate, owned three lots known as lots 6, 7, and 8, Section I, Town Creek Farms Subdivision, located on Three Notch Road in California, Maryland ("the property"). The property was improved by a house rented out as a residence for many years ("the house"). Although the evidence is disputed as to when the last tenants moved out, there was evidence that the house was vacant for two years prior to the loss.

On September 24, 1999, Mutual Fire issued to Corwin Ackerman, the personal representative of Morss' estate, a one-year "Dwelling Property" insurance policy, which included coverage for loss of the house caused by fire. Nearly one year later, on September 18, 2000, the house was extensively damaged by fire, intentionally set by unknown individuals. Thereafter, Ackerman notified Mutual Fire of the fire loss and submitted proof of loss as required under the policy. Mutual Fire denied the claim for two reasons: (1) the house was no longer "used principally for dwelling purposes" as required under the policy because the property had been "vacant for months, with no utility service," and (2) arson was considered to be a form of vandalism, which was specifically excluded from coverage because the house had been vacant for 30 days prior to the loss.

A month before the fire, Ackerman contracted to sell the property to appellee O'Brien. Over a year after the fire, in January 2002, Ackerman deeded the property to O'Brien and shortly thereafter, assigned him all rights under the Mutual Fire policy.

On February 10, 2003, Ackerman and appellee O'Brien filed a complaint in the Circuit Court for St. Mary's County against Mutual Fire, alleging breach of contract. Upon cross-motions for summary judgment, the circuit court concluded that: (1) the house had retained its character as a dwelling, and (2) arson did not constitute vandalism under the policy language. Consequently, the court granted Ackerman and O'Brien's motion for summary judgment on the issue of liability. The parties then stipulated to the amount of damages, and on January 15, 2004, the circuit court entered judgment in favor of O'Brien in the amount of $76,746.63.[1] Mutual Fire noted a timely appeal.

Additional facts will be included where necessary.

---

1. Ackerman was dismissed from the case because he no longer had any interest in the property or the policy.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2–501(e). In reviewing a grant of summary judgment, we must determine whether the circuit court's ruling was legally correct. *See Converge Servs. Group, LLC v. Curran,* 383 Md. 462, 476, 860 A.2d 871 (2004). " 'We review the same information from the record and decide the same issues of law as the trial court.' " *Info. Sys. & Network Corp. v. Fed. Ins. Co.,* 145 Md.App. 457, 463, 805 A.2d 1141, *cert. denied,* 372 Md. 430, 813 A.2d 258 (2002) (citation omitted).

## DISCUSSION

In this case, Mutual Fire and O'Brien

agree on the terms of the insurance contract but disagree as to the proper interpretation. Since the extent of [the insurer's] liability rests on the construction of the disputed language, rather than on the language itself, this is a proper question of law for the court.

*Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 695, 647 A.2d 1297 (1994), *cert. denied,* 337 Md. 214, 652 A.2d 670 (1995).

■■■■ Our construction of an insurance policy is guided by the well-established principles applicable to the construction of contracts in general. *See ABC Imaging of Wash., Inc. v. Travelers Indem. Co. of America,* 150 Md.App. 390, 396, 820 A.2d 628, *cert. denied,* 376 Md. 50, 827 A.2d 112 (2003). In interpreting an insurance contract, we

examine the policy as a whole. Absent evidence that the parties intended a special or technical meaning, words are accorded their usual, ordinary, and accepted meanings. A word's ordinary meaning is the meaning that a reasonably prudent layperson would give to the term. If a reasonable layperson could infer two different meanings from the language used, the language is ambiguous. The court may still

**6**

construe an ambiguous contract, however, where there is no factual dispute presented by the evidence.

*Scherr,* 101 Md.App. at 695, 647 A.2d 1297 (citations omitted).

With these principles in mind, we turn to the interpretation of the insurance policy in this case.

## I.

### Dwelling Purposes

Under the section "Coverages," and subsection "Coverage A–Dwelling," the policy provides that Mutual Fire covered "the dwelling on the Described Location, used principally for dwelling purposes." Mutual Fire claims that because the property was in a state of disrepair, with no working utilities, and allegedly being used as a "drug den," it was not being "used principally for dwelling purposes," and therefore, denial of coverage was justified.

The terms "dwelling" and "dwelling purposes" are not defined under the policy. Therefore, we accord them their "usual, ordinary, and accepted meanings." *See Scherr,* 101 Md.App. at 695, 647 A.2d 1297. *Random House* defines "dwelling" as "a building or place of shelter to live in, place of residence, abode, home." *The Random House Dictionary of the English Language* 445 (unabr. ed. 1973) (*"RHDEL"*). *Black's Law Dictionary* defines "dwelling-house" as "[t]he house or other structure in which a person lives; a residence or abode." *Black's Law Dictionary* 524 (7th ed. 1999)(*"Black's"*). "Purpose" is defined as "the reason for which something exists or is done, made, used, etc." *RHDEL* 1167.

These dictionary definitions, while incorporating the concept of occupancy by a person or persons, do not suggest that actual, continuous occupancy is required in order for property to qualify as a dwelling or a building used for dwelling purposes.[2] Nor does the policy itself state or suggest that

---

2. This is consistent with the definition of "dwelling" in the arson statute. Md.Code (2002), section 6–101(b) of the Criminal Law Article

occupancy by the insured or anyone else is required to sustain coverage. Indeed, Mutual Fire concedes that, in this case, vacancy alone did not justify the denial of coverage. Mutual Fire, rather, alleges that the circuit court failed to consider the condition and use of the property when it granted summary judgment to O'Brien.

This contention is only partially correct. Ruling from the bench, the court explained:

> The fact that people may have been using or dealing drugs ... out of [the property] doesn't turn it into a commercial building.... Not having furniture in it, not having utilities hooked up, does not change that and in fact you—if you say that those are the factors that make it no longer a dwelling unit, then that would happen the minute somebody moves out and—and I don't think that's acceptable.

The circuit court further reasoned that, "as long as [the property is] intended to be used as a dwelling and has not been converted into ... commercial office or ... retail [space], ... it remains a dwelling unit." Thus, the circuit court did consider some facts as to usage and condition of the house.

■ It is undisputed that the house was used as a dwelling until the last tenants moved out. And we think that the circuit court properly placed the burden on Mutual Fire to prove that it was no longer a "dwelling" or being "used principally for dwelling purposes," because this contention was in the nature of an affirmative defense. *See* 6 *Couch on Insurance 3d* § 81.81 (Lee R. Russ ed., 2004) (*"Couch"*) ("The defenses that representations in an application are either ...

---

defines "dwelling" as "a structure any part of which has been adapted for overnight accommodation of an individual, **regardless of whether an individual is actually present.**" (Emphasis added.) *See also Fischer v. State,* 117 Md.App. 443, 451, 700 A.2d 829 (1997), *cert. denied,* 348 Md. 333, 703 A.2d 1264 (1998)("The term dwelling, as defined by [the arson statute], would clearly include a house in which no one is actually residing at the time of the arson because a house generally is 'adapted for overnight accommodation' ").

material to the risk,[3] or that the insurer in good faith would not have issued the policy had it known the true facts, are affirmative defenses which the insurer must plead and prove by a preponderance of the evidence"); 6 *Couch* § 94.108 ("Condition in fire policy suspending or restricting insurance in case of vacancy or unoccupancy is a special limitation or exclusion, not a condition precedent, and insurer had burden of proof"); 17 *Couch* § 254:86 ("The insurer generally bears the burden of establishing any affirmative defense it raises").

We also agree with the circuit court that the mere facts that the tenants had moved out, the property needed some repair, and the utilities were turned off would not alone have been sufficient to meet Mutual Fire's burden on its affirmative defense. Nevertheless, we think the summary judgment record also contained other facts, which, in combination with these facts, are sufficient to create a material dispute of fact on the issue of whether the property was used principally for dwelling purposes.

First, Corwin Ackerman, personal representative of Phyllis Morss' estate, acknowledged in deposition testimony that the property was uninhabitable: "I would have had to put in a new septic system, spent three, four weeks working on the inside of it to make it halfway livable again. [The tenants have] been in there 7 years trashing it pretty good." He said he would have had to spend $10,000 in repairs to put it in rentable condition. Ackerman's view of the condition of the building is reflected in his response to the deposition question: "Was there anybody keeping an eye on the property for you while you were away[?]" His answer was: "Well, it had pretty been trashed and gone through. There wasn't much to keep an eye on."

Additionally, there was evidence that the building was used as a gathering place for teenagers, possibly to distribute and

---

3. Mutual Fire's argument that the policy was no longer effective rested on the notion that when a building ceases to be a dwelling it presents a higher risk of arson or vandalism.

use illegal substances. Ackerman stated: "I've heard there was teenagers down in the bottom of it smoking dope. I think it could have been [the son of the former tenants]. He's known to like some rock[.]" Ackerman also characterized the property as a "teenage club-house." A neighbor had seen "kids going in and out of there" all the time.[4]

Also at odds with the circuit court's conclusion that the building on the property was "intended to be used as a dwelling" is evidence that the property would likely be converted to commercial use. Ackerman agreed that the tenants may have moved out in September 1998, two years before the fire; yet, he had done no repairs to the house since then. Notably, Ackerman did **not** say he had any plans to do the necessary repairs to rent out the house as a residence. Rather, his intention, as personal representative, was to "wai[t] on the sale of the property" and try to make mortgage payments until then. There was also evidence that Ackerman talked to a realtor "numerous" times about selling it as commercial property before the actual sale to O'Brien.

O'Brien's intention at the time he contracted to purchase the property in August 2000 was ambivalent. His long-term plans for the property were commercial. His contract with Ackerman to purchase the three lots comprising the property was contingent upon getting a site plan approved for the construction of an office building. At his deposition, O'Brien explained that in the last 20 years, the neighborhood had gradually made a transition from residential to commercial

---

4. Although this evidence refers to hearsay testimony, without an objection from appellees either here or in the motions court, we must treat the statements as admissible evidence. *See, e.g., Halliday v. Sturm, Ruger & Co., Inc.,* 138 Md.App. 136, 153, 770 A.2d 1072, *cert. denied,* 365 Md. 266, 778 A.2d 382 (2001)(failure of party opposing summary judgment to object to lack of foundation for purported photograph offered by moving party in support of summary judgment required appellate court to "treat the photograph as authentic"); *see generally* 73 *Am.Jur.2d Summary Judgment* § 50 ("while [hearsay] evidence that might be excluded at the trial may not be used as a basis for granting summary judgment in favor of the party offering it, it may be considered in ascertaining whether a triable issue exists, so it may be utilized as the basis for denying summary judgment").

use. According to O'Brien, within a mile radius of the property, only four properties out of forty were used residentially. When asked about his intention regarding the house specifically, he replied that he intended "to rent it out until we found a user and either enter into a lease agreement for a commercial use or build an addition or demolish it, depending on the circumstances." He did not specify whether the house would be rented in the meantime to a residential tenant or for business purposes. He did indicate, however, that in the past, he had done both with respect to similarly located properties.[5]

We conclude that these facts, when viewed together, would permit the trier of fact to infer that at the time of the fire, the house was not being used for dwelling purposes. Let us be clear—we are not suggesting that the intention to convert a property from residential to commercial in the near future is itself controlling or sufficient. It is not. But when such intent is combined with a two-year vacancy, an uninhabitable condition not repaired within two years, virtual abandonment of the building by the owner, and use by local teenagers as a hangout for illegal drug use, its status becomes unclear, and a trier of fact could infer that the building was not "used principally for dwelling purposes."

Accordingly, we vacate the circuit court's summary judgment in favor of O'Brien and remand for further proceedings on the issue of whether the house was "used principally for dwelling purposes." Such proceedings may include further motions for summary judgment, as well as trial on disputed facts.

We wish to be clear about the limits of this holding. We are not saying that summary judgment could not be justified if based on other grounds. For example, throughout our discus-

---

5. The transcript from O'Brien's deposition reads:

 Q: Why wasn't whether there was an existing tenant at the property an issue for you when you purchased the property?

 A: I guess in the past when I've bought properties along [Three Notch Road], we rented them out either to business people or to residential tenants; and we always have to make repairs and improvements.

sion we have been assuming, because it was not argued otherwise, that the policy's "used principally for dwelling purposes" language created a requirement, binding on the insured at the time of the fire. As the insured did not raise the issue below, or in this Court, we cannot reach the question of whether this language was a warranty, as opposed to merely descriptive, and therefore not a continuing obligation of the insured. *See* 6 *Couch* §§ 83:1 to 83.23 (discussing whether statement as to conditions constitutes a warranty, binding on the insured, and collecting cases thereon). *See also Rush v. Hartford Mut. Ins. Co.,* 652 F.Supp. 1432, 1435 (W.D.Va.1987)("The mere statement that the insured property is a dwelling used principally for dwelling purposes is not clear and explicit enough to create a warranty. As such the terms are only a representation or description," and not a continuing obligation of the insured)(applying Virginia law).

## II.

### Arson

Under the heading "Perils Insured Against," the policy provides:

**Coverage A Dwelling** ...

We insure for all risks of physical loss to the property ... **except:**

\* \* \*

**vandalism** and malicious mischief, theft or attempted theft, or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

**Coverage C Personal Property**

We insure for direct loss to property ... **caused by:**

1. **Fire** or lightning.

\* \* \*

8. **Vandalism** or malicious mischief.

This peril does not include loss by pilferage, theft, burglary or larceny. (Emphasis added.)

## A.

## Defining "Vandalism"

Mutual Fire contends that arson is a form of vandalism, and therefore, because the property was vacant for at least 30 days before the fire, the loss is excluded from coverage. The term "vandalism" is not defined by the policy. Mutual Fire urges us to assume that the unknown individuals who set the fire were "vandals," and therefore, the fire was a form of "vandalism." We do not read the policy in this manner.

*Random House* defines "vandalism" as "deliberately mischievous or malicious destruction or damage of property." *RHDEL* 1579. *Black's Law Dictionary's* definition is "[w]illful or ignorant destruction of public or private property, esp. of artistic, architectural, or literary treasures." *Black's* 1550. Under a broad reading of these definitions, the destruction of property by intentionally set fire may be a form of "vandalism."

Like our counterpart court in New Mexico, we do not think, however, that "the search for meaning should end with the very broad definition" of vandalism afforded by dictionaries. *See Battishill v. Farmers Alliance Ins. Co.*, 136 N.M. 288, 97 P.3d 620, 623 (2004), *cert. granted*, 136 N.M. 492, 100 P.3d 198 (2004). "Quite apart from the dictionary, there exists a sense that the common and ordinary meaning of vandalism is something different than that of arson." *Id.* (citation omitted).

The New Mexico Court of Appeals' analysis in *Battishill* is helpful. There, the court rejected the insurer's argument that vandalism included arson, at least "in the context of dwelling insurance, purchased to insure against the dreaded risk of fire." *Id.* at 624. The *Battishill* Court concluded instead that, "to the ordinary and reasonable homeowner ... vandalism means something much different from arson." *Id.* The court began its analysis with the word "vandal," which has as

its origin a fifth century Germanic group that ravaged France, Spain, and North Africa before sacking Rome in 455 A.D., destroying monuments of art and literature. *Id.* The court reasoned, then, that "vandalism" is the " 'spirit or conduct of the Vandals,' " and is "synonymous with hooliganism and malicious mischief." *Id.* (citation omitted).

The court further recognized that "many, if not most, ordinary citizens and reasonable insureds ... think of arsonists and vandals, and arson and vandalism, as **distinct actors and acts.**" *Id.* at 625 (emphasis added). For these reasons, the *Battishill* Court concluded that

> vandalism in a dwelling left vacant for thirty days is more likely to mean damage that is not devastating, but rather to mean damage from someone breaking windows, breaking in to see what is inside, and/or to do indiscriminate damages by defacing walls, pulling fixtures out, scarring floors, bashing artifacts, harming items of art or priceless objects, and similar types of behavior, **not intentionally setting the dwelling ablaze for its total and very substantial destruction.**

*Id.* (emphasis added).

We find the reasoning of the New Mexico Court of Appeals highly persuasive and conclude, for the reasons it articulated, that a "reasonably prudent layperson" **could** consider arson to be separate from, and not included in, the term vandalism.

This construction is also consistent with the differential treatment of arson and malicious destruction[6] under the Criminal Law Article. Arson in the first degree, which is the willful and malicious burning of a dwelling, is a **felony** offense, punishable by imprisonment up to 30 years and/or fines up to $50,000. *See* Md.Code (2002), § 6–102 of the Criminal Law Article ("CL"). In contrast, malicious destruction of property, which is the willful and malicious destruction, injury or deface-

---

6. Vandalism falls under the crime of malicious destruction. *See* Index entry for "vandalism," Md.Code (2002), Index of the Criminal Law Article.

14

ment of the real or personal property of another, is a **misde-meanor** offense, punishable by imprisonment up to 3 years and/or fines up to $2,500 (where damage is at least $500). *See* CL § 6–301.

## B.

### Policy Ambiguity

 This is not to say, however, that there is no ambiguity in the provisions of the policy respecting vandalism and arson. A contract term is ambiguous if a reasonable layperson could infer two different meanings from the language used. *See Pacific Indemnity Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 389, 488 A.2d 486 (1985). As an alternative to the definition advanced in *Battishill,* discussed above, a reasonable layperson could also read the term "vandalism" broadly, as Mutual Fire urges, to **include** the act of a vandal setting fire to a building. Considering these diverging definitions, we think the policy is ambiguous in this respect.

The policy is independently ambiguous because "fire" and "vandalism" are listed as **separate** perils insured against for personal property coverage. *See Battishill,* 97 P.3d at 626 (concluding that the narrower definition of "vandalism" did not include arson, and that the listing of vandalism and fire as separate perils in the personal property section of coverage created an overall policy ambiguity to be construed against the insurer such that vandalism did not include arson); *United Capital Corp. v. Travelers Indem. Co. of Ill.,* 237 F.Supp.2d 270, 276–77 (E.D.N.Y.2002)(holding that listing of "fire" and "vandalism" as separate perils in personal property section rendered use of "vandalism" in dwelling section ambiguous, and construing language in favor of the insured, to provide coverage for arson); *Nationwide Mut. Fire Ins. Co. v. Nationwide Furniture, Inc.,* 932 F.Supp. 655, 657 (E.D.Pa. 1996)(same). Because of this separate listing of these perils, two different meanings could be inferred.

First, a reasonable layperson reading only the dwelling coverage section could infer, under the broader definition, that

"vandalism" included intentionally set fires. On the other hand, looking at the policy as a whole, the distinction between "fire" and "vandalism" with regard to personal property could cause a reasonably prudent layperson to conclude that they were also different for dwelling coverage purposes. Under this interpretation, fire, even though incendiary in nature, would **not** be considered a form of vandalism for dwelling coverage purposes.

The Court of Appeals has instructed us how to proceed when faced with an ambiguous contract.

If the language of the contract is ambiguous, extrinsic evidence may be consulted to determine the intention of the parties and whether the ambiguous language has a trade usage. Construction of the contract by the parties to it before the controversy arises is an important aid to interpretation of uncertain terms.

If the extrinsic evidence presents disputed factual issues, construction of the ambiguous contract is for the jury. The court may construe an ambiguous contract if there is no factual dispute in the evidence.

*Pacific Indemnity Co.*, 302 Md. at 389, 488 A.2d 486 (citations omitted). Further explaining the court's role in interpreting an ambiguous contract, Judge Rodowsky wrote for the Court of Appeals:

Where the meaning of a controlling term in a policy is ambiguous, "extrinsic evidence is admissible . . . to show the parties' intent and to show whether the term does or does not have a particular trade usage." If no party presents extrinsic evidence bearing upon the meaning of the ambiguous term, "we would normally apply the 'principle of contract construction that where one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against that party.' "

*Id.* at 405, 488 A.2d 486 (citations omitted).

■ Because of this ambiguity, extrinsic evidence is admissible to show the intention of the parties to the contract.

And because the parties filed cross motions for summary judgment, and there was no trial, they may not have offered disputed extrinsic evidence that was available. Accordingly, we remand this case to the circuit court for the receipt of any admissible extrinsic evidence that the parties may offer on this issue. *See Sallie v. Tax Sale Investors, Inc.*, 149 Md.App. 141, 162, 814 A.2d 572 (2002)(ordering remand for receipt of extrinsic evidence regarding insurance coverage after appellate court vacated summary judgment). If the parties have no admissible extrinsic evidence, or any extrinsic evidence is undisputed, the contract should be construed by the court rather than the jury. The court or the jury, as the case may be, should resolve any remaining ambiguity against the insurer, as the drafter of the contract. *See Pacific Indemnity Co.*, 302 Md. at 389, 488 A.2d 486.

## CONCLUSION

For the reasons set forth above, we vacate the summary judgment entered by the circuit court in favor of O'Brien on both issues I and II, and remand for further proceedings below. Such proceedings may include further motions for summary judgment, as well as trial on disputed facts.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR ST. MARY'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**