**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 09-1394**

───────────

ALPHA CONSTRUCTION AND ENGINEERING CORPORATION; RUMMEL, KLEPPER & KAHL; UNITED STATES FIDELITY AND GUARANTY COMPANY; THE AMERICAN INSURANCE COMPANY,

        Plaintiffs - Appellants,

    v.

THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

        Defendant - Appellee.

───────────

Appeal from the United States District Court for the District of Maryland, at Baltimore.   J. Frederick Motz, District Judge. (1:06-cv-02352-JFM)

───────────

Argued:  May 13, 2010        Decided:  September 22, 2010

───────────

Before KING and DAVIS, Circuit Judges, and C. Arlen BEAM, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

───────────

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.  Senior Judge Beam wrote a concurring and dissenting opinion.

───────────

**ARGUED:** Patrick James Attridge, KING & ATTRIDGE, Rockville, Maryland; Robert Lawrence Ferguson, Jr., FERGUSON, SCHETELICH & BALLEW, PA, Baltimore, Maryland, for Appellants.  J. Gregory Lahr, SEDGWICK, DETERT, MORAN & ARNOLD, New York, New York, for Appellee.  **ON BRIEF:** Michele Z. Blumenfeld, FERGUSON, SCHETELICH

& BALLEW, PA, Baltimore, Maryland, for Appellants.   Stacey A.
Moffet, ECCLESTON & WOLF, PC, Hanover, Maryland, for Appellee.

—————————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The plaintiffs in this declaratory judgment action, Alpha Construction and Engineering Corporation ("Alpha"), Rummel, Klepper & Kahl ("RKK"), United States Fidelity and Guaranty Company ("USF&G"), and The American Insurance Company ("American") (collectively, the "Plaintiffs"), appeal from the district court's judgment in favor of defendant The Insurance Company of the State of Pennsylvania ("ICSP," or the "Defendant"), resolving an insurance coverage dispute. See Alpha Constr. & Eng'g Corp. v. Ins. Co. of State of Pa., 601 F. Supp. 2d 684 (D. Md. 2009) (the "Opinion") (awarding summary judgment to ICSP and denying summary judgment to Plaintiffs). As explained below, we are content to affirm the district court on its insurance coverage declaration. On the other hand, we vacate its reimbursement award and remand for further proceedings.

I.

A.

The Maryland Transit Administration ("MTA") is a state governmental agency that provides rail, bus, and other transit

3

services within the confines of Maryland.[1] MTA's Construction Division manages its capital improvement programs. Most of the Construction Division's staff is leased by MTA from outside independent firms through so-called "consultant contracts." Alpha and RKK were independent firms that provided inspectors and resident engineers to MTA for its projects. Various agreements between MTA, Alpha, RKK, and other firms allowed MTA to have a labor pool readily available for its various construction projects.

In January 2003, MTA was involved in construction and improvement work at the Rogers Avenue Metro Station in Baltimore (the "Weatherization Project"), and a firm called Maple Construction ("Maple") was the general contractor for this undertaking. On January 13, 2003, MTA received a report of a safety violation at the Rogers Avenue station, and two MTA inspectors, Michael Gray and Anthony Combs (inspectors supplied to MTA by Alpha and RKK, respectively), were dispatched to the station. Upon arriving at the Rogers Avenue station, Gray saw a large piece of plywood perched above an escalator. The evidence reflects that Maple's employees used several similar boards to

---

[1] The MTA is liable for its contracts and torts and for the torts of its officers, agents, and employees in connection with the performance of the duties and functions of the agency. See Md. Code Ann., Transp. § 7-702(a).

4

cover an opening to the escalator while they worked on the Weatherization Project during daylight hours. During the night, all but one board was removed, however, apparently because Maple's owner and project foreman decided there was no point in taking the last board down. Although Gray noticed some wire on or near the single board, he could not ascertain whether the plywood was tied securely. While in the process of examining the board, Gray lifted and dislodged it, causing the board to fall onto the back and head of MTA passenger Mary Griffin as she ascended the escalator. Griffin sustained serious and permanent injuries as a result.

Griffin thereafter settled her personal injury lawsuit arising from the foregoing incident for the sum of $855,000. The settlement involved a number of parties — MTA, Maple, MTA's and Maple's general liability insurer (ICSP), Alpha and its general liability carrier (USF&G), and RKK and its general liability carrier (American). In the Settlement Funding Agreement, each of the settling parties reserved the right to seek reimbursement from one another for the defense costs and indemnity payments incurred. Nonetheless, the actual settlement funds came from the three insurers — ICSP, USF&G, and American — and the Settlement Funding Agreement was signed by representatives of each of these insurers. The Agreement states that the possible negligence and liability of the various

5

parties had not been adjudicated or apportioned and expressly reserved such issues for future determination.

The general liability policy issued to MTA by ICSP for the Weatherization Project (the "ICSP Policy") was part of an owner controlled insurance program, called an "OCIP." OCIPs, also known as wrap-around insurance programs, provide insurance coverage for those contractors and subcontractors supplying direct labor or personnel at a construction project, and insure against the risk of loss arising from, inter alia, property damage, personal injury, and workers' compensation claims. Under the ICSP Policy issued to MTA, ICSP provided a defense for both MTA and Maple in the Griffin lawsuit, but denied coverage for Alpha and RKK and their employees Gray and Combs.

B.

As a result of the foregoing events, Alpha and RKK, on behalf of themselves and their insurers USF&G and American, filed this declaratory judgment action in the district court, alleging diversity jurisdiction and seeking a declaration that Alpha and RKK and their employees, Gray and Combs, were insureds under the ICSP policy. Alpha and RKK sought a declaration from the district court that ICSP owed them and/or Gray and Combs a duty to defend the Griffin lawsuit and a duty to indemnify them for the settlement contributions made on their behalf. ICSP counterclaimed against Alpha, alleging that it was entitled to

6

contribution or indemnity from Alpha for the costs it had incurred in defending MTA and in paying the sum of $400,000 to help settle the Griffin lawsuit.

### 1.

In addressing the cross-motions of the parties for summary judgment, the district court declared in its Opinion that ICSP was entitled to prevail on the insurance coverage contentions presented by the Plaintiffs.[2] First, the court assessed the

---

[2] Importantly, in issuing its coverage declaration, the district court recognized that "[t]he contracts in dispute in this case were made in Maryland and, accordingly, Maryland substantive law governs." Alpha Constr. & Eng'g, 601 F. Supp. 2d at 688. The court further recognized that,

> [w]hen interpreting the meaning of an insurance policy, Maryland courts "construe the instrument as a whole to determine the intention of the parties." Clendenin Bros., Inc. v. U.S. Fire Ins. Co., 889 A.2d 387, 393 (Md. 2006) (citing Cheney v. Bell Nat'l Life Ins. Co., 556 A.2d 1135, 1138 (Md. 1989)). Courts will look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage. Id. (quoting Cole v. State Farm Mut. Ins. Co., 753 A.2d 533, 537 (Md. 2000)). The court is to give a term within the contract its "usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." Id. (citations omitted). Maryland courts will examine "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Id. (quoting Pacific Indem. Co. v. Interstate Fire & Cas. Co., 488 A.2d 486, 488 (Md. 1985)).

> If the terms used in the insurance policy are unambiguous, the court will determine the meaning of the terms of the contract as a matter of law; however,

(Continued)

7

Plaintiffs' contention "that Alpha and RKK are 'insureds' under the ICSP Policy," and concluded that "[t]he terms of the ICSP Policy demonstrate that the Policy does not provide coverage to Alpha and RKK." Alpha Constr. & Eng'g, 601 F. Supp. 2d at 689. The court explained:

> Plaintiffs argue that Alpha and RKK are included within the Policy's definition of "Named Insured," which includes "[a]ll contractors, all tiers of subcontractors, each separate contractor of [MTA], others to whom [MTA] Contracts to furnish insurance under the insurance program" for the Weatherization Project. Plaintiffs describe Alpha and RKK as "contractors," "separate contractors of [MTA]," or, alternatively, "others to whom [MTA] Contracts to furnish insurance . . . ."

> Alpha and RKK might appear to be insureds under the Policy's definition of "Named Insured"; however, they are explicitly excluded from coverage by Endorsement MS # 00006 of the Policy. The Endorsement provides that "coverage for 'Named Insured(s)' shall be automatically effected based upon issuance of a workers compensation policy as afforded by the wrap-up program/owner controlled insurance program." The Endorsement also states that the Policy "does not apply to any of the following as an insured: . . .

---

if the language is ambiguous, extrinsic evidence may be consulted. Id. (citations omitted). A term of a contract is ambiguous "if, to a reasonably prudent person, the term is susceptible to more than one meaning." Id. (citing Cole, 753 A.2d at 537). Summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be resolved by reference to extrinsic evidence. Washington Met. Area Transit Auth. v. Potomac Inv. Props., Inc., 476 F.3d 231, 235 (4th Cir. 2007).

Alpha Constr. & Eng'g, 601 F. Supp. 2d at 688-89.

8

[e]xcept as respects to any contractor or subcontractor who will have employees engaged in work at the project hereof who are not provided workers compensation and employers liability coverage under the owner provided insurance program, unless specifically endorsed to the policy." Although this provision is not artfully worded, it is included among provisions which explicitly list those entities and individuals who are not covered under the Policy. Its import is clear: those contractors or subcontractors who are not provided workers' compensation and employer's liability coverage under OCIP are not insured under the ICSP Policy. Thus, if Alpha and RKK were not provided workers' compensation and employer's liability coverage under OCIP, they were not insured under the ICSP Policy.

Plaintiffs present no evidence that Alpha and RKK were provided any coverage under OCIP. In fact, the record evidence indicates quite the opposite. Catharine Jones, MTA's project manager of OCIP, testified in her deposition that neither Alpha nor RKK was ever covered under OCIP. Jones identified at her deposition a spreadsheet dated March 31, 2007, and kept by MTA's broker, listing all of the companies that were ever enrolled in the OCIP starting in 2000. Alpha and RKK do not appear on the list. Additionally, the Alpha and RKK Contracts (collectively "Consulting Contracts") do not incorporate, either directly or by reference, the terms and conditions of the ICSP Policy, and they do not reference participation in OCIP. John Cousins, MTA's Manager of Procurement, testified that consultant contracts of the type entered into by Alpha and RKK typically do not contain an application for enrollment in OCIP because "[w]e [MTA] don't enroll consultants in OCIP." In fact, the Consulting Contracts require Alpha and RKK to enter into their own workers' compensation and comprehensive general liability insurance and to name MTA as an additional insured under their comprehensive general liability policies. Moreover, both the RKK and Alpha Contracts state that they are the "exclusive statement" of the parties' agreement, suggesting that Plaintiffs' reliance on the provisions of the ICSP Policy is misplaced.

Id. at 689-90 (alterations in original) (footnotes and citations omitted). According to the court, "[b]ecause Alpha and RKK cannot demonstrate that they were provided coverage under OCIP, . . . they are not covered by the ICSP Policy." Id. at 690. Thus, "ICSP had no duty to defend or indemnify [Alpha and RKK] in the underlying suit." Id. at 691.[3]

Next, the district court assessed the Plaintiffs' contention "that, under the doctrine of equitable subrogation, they are entitled to reimbursement from ICSP based on their common law indemnity rights against individuals (Gray and Combs) who were . . . insured under the ICSP Policy." Alpha Constr. & Eng'g, 601 F. Supp. 2d at 691. The court concluded that, because "Gray and Combs were not insured under the ICSP Policy," there was no merit to the Plaintiffs' equitable subrogation theory. Id. On this issue, the court explained:

> In support of their claim that the ICSP Policy includes Gray and Combs as insureds, Plaintiffs assert that Gray and Combs were "employees" of MTA at the time of the Griffin incident. Under the section "WHO IS AN INSURED," the ICSP Policy includes "employees" of MTA. The Policy does not define "employee" except to state that "employee" includes a "leased worker" but not a "temporary worker." "Leased worker" is defined as "a person leased to [MTA] by a labor

---

[3] Notably, the district court also rejected the Plaintiffs' alternative theory "that Alpha and RKK should be covered under the ICSP Policy as third-party beneficiaries of the Policy and of the Maple Contract." See Alpha Constr. & Eng'g, 601 F. Supp. 2d at 690-91.

10

leasing firm under an agreement between [MTA] and the labor leasing firm, to perform duties related to the conduct of [MTA's] business." A "temporary worker" is "a person who is furnished to [MTA] to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." Plaintiffs assert that Gray and Combs were "leased workers."

I need not determine whether Gray and Combs could be properly characterized as "employee[s]" or "leased worker[s]" of MTA because even if that characterization were appropriate, Plaintiffs may not use an equitable subrogation argument to circumvent their clear exclusion under the terms of the ICSP Policy. Under Maryland law, "any construction of a contract that makes another provision superfluous is generally disfavored." National Cas. Co. v. Lockheed Martin Corp., 415 F. Supp. 2d 596, 602 (D. Md. 2006) (citing Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co., 688 A.2d 496, 503 (Md. Ct. Spec. App. 1996) ("A contact must be construed as a whole, and effect given to every clause and phrase, so as not to omit an important part of the agreement.")); see also 11 Richard A. Lord, Williston on Contracts § 32:5 (4th ed. 1992) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable"). In this case, if I were to accept Plaintiffs' reading and find that the terms "employee[s]" or "leased worker[s]" applied to Gray and Combs, the ICSP Policy's exclusion of those contractors or subcontractors not provided coverage under OCIP, like Alpha and RKK, would be rendered effectively meaningless. As discussed above, Endorsement MS # 00006 of the ICSP Policy provides that no contractor or subcontractor will receive coverage under the Policy unless first provided coverage under OCIP. The enrollment process for OCIP gives MTA the discretion to choose which entities participate in OCIP. IF MTA chose to explicitly exclude entities like Alpha and RKK from coverage, but the employees those entities provided to MTA were nonetheless covered, the terms of Endorsement MS # 00006 would have no effect. As Alpha and RKK have no relationship with MTA but to provide "'competent personnel' to work on MTA construction projects," insuring an Alpha or RKK employee against third-party

11

claims would have essentially the same effect as insuring Alpha or RKK themselves, a result clearly contrary to the terms of Endorsement MS # 00006.

Alpha Constr. & Eng'g, 601 F. Supp. 2d at 691-92 (alterations in original) (citations omitted). The court summarized that, because "Gray and Combs are not insured under the ICSP Policy, Plaintiffs are not entitled to equitable subrogation from Defendant for their defense and settlement expenses in the underlying suit." Id. at 692.

2.

The district court then focused in its Opinion on ICSP's counterclaim for reimbursement, in which ICSP asserted "that Alpha breached the Alpha Contract by failing to defend or indemnify MTA in the Griffin suit." Alpha Constr. & Eng'g, 601 F. Supp. 2d at 692. The court agreed with ISCP that, pursuant to the Alpha Contract, "Alpha owed MTA a duty to defend and indemnify in the underlying suit." Id. The Opinion explained the court's reimbursement award as follows:

> In Maryland, an insurer has a duty to defend when there exists a "potentiality that the claim could be covered by the policy." Litz v. State Farm Fire and Cas. Co., 695 A.2d 566, 570 (Md. 1997) (citation omitted). In this case, the source of Alpha's duty to defend is not an insurance policy, but rather the Alpha Contract, which provides "[t]he consultant [Alpha] shall pay any claims for personal injury, bodily injury, or property damage which the Consultant is legally obligated to pay and shall indemnify the State against such claims. The Consultant shall undertake to defend any third party claim seeking such damages." The indemnity provision of the Alpha

12

Contract requires Alpha to indemnify MTA against all claims arising from "errors, omissions, negligent acts . . . of [Alpha] or those of his . . . agents or employees under this Contract . . . ." A negligence claim is clearly potentially covered. The Griffin suit was a personal injury action by a third party which specifically named Gray, an Alpha employee, as committing the act which led to Griffin's injury. The facts alleged in the underlying complaint clearly brought the claim within Alpha's duty to defend under the Alpha Contract.

The duty to indemnify is more narrow. While the duty to defend depends only upon the facts as alleged, the duty to indemnify depends upon liability. Walk v. Hartford Cas. Ins. Co., 852 A.2d 98, 106 (Md. 2004) (citation omitted). The Fourth Circuit has held that the duty to indemnify may be triggered by a settled liability. St. Paul Fire & Marine Ins. Co. v. Am. Int'l Speciality Lines Ins. Co., 365 F.3d 263, 274 (4th Cir. 2004). The issue is whether the claims against the named defendants in the underlying suit and the facts pled in that action would give rise to an indemnification obligation under the agreement between the parties. Id. The indemnity provision of the Alpha Contract provides that Alpha shall indemnify MTA

> from and against all claims, suits, judgements, expenses, actions, damages and costs of every name and description arising out of or resulting from errors, omissions, negligent acts, negligent performance or nonperformance of the services of the Consultant [Alpha] or those of his subcontractors, agents or employees under this Contract . . . .

The facts pled and the claims asserted in the underlying action provide sufficient evidence to determine that the settled liability is encompassed by Alpha's indemnification obligation. See St. Paul Fire & Marine Ins. Co., 365 F.3d at 273-74. The Griffin complaint charged the defendants (including Alpha) "by and through their various agents, servants, and/or employees" with negligence. Specifically, the complaint alleged that the plywood which injured

13

> Griffin fell when Gray, an Alpha employee, was handling it, and the testimony in the underlying action demonstrates that Gray was indeed inspecting and lifting the plywood when it fell, a duty that was part of his performance under the Alpha Contract. Plaintiffs themselves admit that the fact that Griffin was injured when Gray was inspecting the plywood "may be some evidence of Gray's negligence." Though Griffin charged the named defendants collectively with negligence, she alleged that it was Gray's actions or omissions which caused her injury. As Gray was an "employee[]" of Alpha, the settlement of Griffin's allegations against him triggered Alpha's duty to indemnify MTA.

Alpha Constr. & Eng'g, 601 F. Supp. 2d at 692-93 (alterations in original) (footnotes and citations omitted). In these circumstances, the court concluded "that Alpha breached its duties to defend and indemnify MTA in the underlying action, and ICSP is entitled to reimbursement from Alpha [in the amount of] the costs it incurred in the underlying suit." Id. at 694. The court awarded ICSP $400,000 — "the specific amount requested by ICSP in its counterclaim" and the amount "that ICSP paid . . . in settling the Griffin suit." Id. at 694 & n.10.

In accordance with its Opinion, the district court entered an Order on March 9, 2009, denying the Plaintiffs' request for summary judgment, awarding summary judgment to ICSP, and imposing a reimbursement award of $400,000 plus prejudgment interest and costs. The Plaintiffs timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

14

II.

We review de novo a district court's award of summary judgment, applying the standards set forth in Federal Rule of Civil Procedure 56 and viewing the facts in the light most favorable to the nonmoving party. See Lee v. York Cnty. Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007). Where "an appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court." Monahan v. Cnty. of Chesterfield, Va., 95 F.3d 1263, 1265 (4th Cir. 1996) (internal quotation marks omitted).

III.

On appeal, the Plaintiffs challenge two aspects of the district court's Opinion. First, they contend that the court erred in its insurance coverage declaration, in that Alpha and RKK are entitled to reimbursement from ICSP under the doctrine of equitable subrogation, because Gray and Combs were "insureds" under the ICSP Policy.[4] We reject the Plaintiffs' contention in

---

[4] The Plaintiffs have abandoned on appeal their theory that Alpha and RKK were "insureds" under the ICSP Policy. See Br. of Appellants 21 n.10. ("While Appellants maintain that the District Court's ruling was incorrect, Appellants do not raise that issue in this Appeal.").

15

this regard and affirm the insurance coverage declaration on the reasoning of the district court.  See supra Part I.B.1.

Second, the Plaintiffs assert that the district court erred in imposing the $400,000 reimbursement award.  On this aspect of the Opinion, we agree with the district court that, under the Alpha Contract, Alpha was obliged to defend MTA in the underlying Griffin suit.  Nevertheless, we cannot endorse the court's ruling that, as a matter of law, Alpha was required to indemnify MTA, thus entitling ICSP to reimbursement of the full amount of costs it incurred in settling Griffin's claims.  See supra Part I.B.2.

As the Plaintiffs maintain, the issue of whether Alpha had a duty to indemnify MTA depends on whether Gray's negligence was the sole (or at least a contributing) cause of Griffin's injuries.  That is so because, under the express terms of the Alpha Contract, Alpha is required to indemnify MTA for only Alpha's or its employee's negligence.  Significantly, Alpha did not agree to indemnify MTA for the negligence of MTA or anyone else.  See Heat & Power Corp. v. Air Prods. & Chems., Inc., 578 A.2d 1202, 1208 (Md. 1990) (recognizing "that a [non-insurance] contract will not be construed to indemnify a person against his own negligence unless an intention to do so is expressed in those very words or in other unequivocal terms" (internal quotation marks omitted)).  Thus, the $400,000 reimbursement

16

award is appropriate only if Gray was 100% at fault for the Griffin incident.

Although Gray was conceivably negligent at the Rogers Avenue station, this question has not yet been determined as required by the parties' Settlement Funding Agreement. There was, at best, a comedy of errors leading to Griffin's injuries. Surely the Maple employee that left the board in place after-hours, and perhaps failed to properly secure it, was possibly negligent as well. In paragraph seventeen of Griffin's complaint, she alleges that all of the defendants (including MTA, Maple, Alpha, and RKK) and their various agents and employees were negligent for, inter alia, (1) failing to prevent falling objects, (2) failing to remedy the dangerous situation, (3) failing to give notice of the dangerous condition, (4) failing to prevent the accident, (5) failing to properly oversee and inspect the site, (6) failing to close the site during construction, (7) failing to inspect the site entrance, and (8) failing to secure the materials at the site. In other words, Griffin's complaint did not single out Gray as the sole tortfeasor.

The district court thus erred when it concluded that "[t]he facts pled and the claims asserted in the underlying action provide sufficient evidence to determine that the settled liability is encompassed by Alpha's indemnification obligation."

17

<u>Alpha Constr. & Eng'g</u>, 601 F. Supp. 2d at 693. Rather, Alpha's negligence-based liability, if any, must actually be adjudicated or agreed upon before it can be determined whether Alpha is obliged to indemnify MTA and, if so, in what amount. <u>Cf.</u> <u>St. Paul Fire & Marine Ins. Co. v. Am. Int'l Speciality Lines Ins. Co.</u>, 365 F.3d 263, 273-75 (4th Cir. 2004) (concluding summary judgment appropriate where one party had agreed to indemnify all parties for ordinary negligence and it was undisputed that settlement liability was for ordinary negligence only). In these circumstances, we are constrained to vacate the reimbursement award and remand for further proceedings.

IV.

Pursuant to the foregoing, we affirm in part, vacate in part, and remand for such other and further proceedings as may be appropriate.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>

18

BEAM, Senior Circuit Judge, concurring and dissenting:

The plaintiffs, Alpha, RKK, USF&G and American raise discrete and intertwined issues of insurance and indemnity contract interpretation. The district court entered judgment in favor of defendant ICSP on all issues. The majority of this panel acting for the court (the court) affirms the district court on all points except for the question of whether total indemnification is due ICSP under an indemnity/save harmless agreement between MTA and Alpha. I concur in the court's vacation of the district court's indemnification award to ICSP and in its remand of the question of Alpha's duty to ICSP in this regard. I respectfully dissent from the balance of the issues affirmed by the court.


                              I.

I begin with the indemnity contract dispute between MTA and Alpha over whether Alpha and USF&G owed MTA a duty to defend against claims asserted by Griffin against MTA and its employees. The district court found the "save harmless" portion of the indemnification agreement, which I set out in detail below, required Alpha, or its insurer USF&G, to reimburse MTA, or its insurer ICSP, for all costs incurred in defending the various third-party claims asserted by Griffin against MTA in the Maryland trial court. This "duty to defend," according to

19

the district court, was separate and apart from the obligation of Alpha (through USF&G) to indemnify ICSP for ICSP's (for MTA) settlement payments to Griffin, an obligation now correctly vacated by the court.  It is undisputed that the costs of defending MTA against the Griffin allegations were paid by ICSP. Accordingly, imposition by the district court of this duty to defend MTA upon Alpha and USF&G allows ICSP to step into the shoes of MTA and to be reimbursed for these costs by Alpha or USF&G under the doctrine of equitable subrogation.

This duty to defend MTA, says ICSP, the district court and now this court, emerges from the language of the indemnity agreement between the parties.

The words from which this obligation of Alpha purportedly springs are as follows:

> The Consultant(s) [Alpha] shall indemnify and save harmless the Department of Transportation [MTA], the Administration, their Officers, agents, and employees from and against all claims, suits, judgements, expenses, actions, damages and costs of every name and description arising out of or resulting from errors, omissions, negligent acts, negligent performance or nonperformance of the services of the Consultant [Alpha] or those of his subcontractors, agents or employees [Gray] under this Contract, or arising from or based on the violation of applicable federal, state or local law, ordinance, regulations, order or decree, whether by himself or his employees or subcontractors.

> Further, the consultant [Alpha] shall pay any claims for personal injury, bodily injury or property damage which the Consultant [Alpha] is legally obligated to pay and shall indemnify the State against such claims [against Alpha].  The Consultant [Alpha] shall

20

undertake to defend any third party claim seeking such damages.

J.A. 157. From this language, neither Alpha nor its insurer USF&G acquired a duty to defend or to indemnify MTA against allegations of negligence or liability leveled against anyone except Alpha and its employees. At best, Alpha's duty to defend MTA extended no further than a claim against MTA "arising out of or resulting from errors, omissions, negligent acts, negligent performance or nonperformance" of *Alpha* and *Alpha's* employees.

However, such an obligation is not in play in this dispute. USF&G, Alpha's insurer, incurred all defense costs arising from all claims made against Alpha or its employees. Indeed, ICSP specifically denied Alpha coverage and refused to defend Alpha and its employees. Accordingly, I dissent from the holding of the court that extends Alpha's duty beyond the indemnity agreement's specific obligation. It seems probable that the district court's decision in this regard, now affirmed by the court, arose from the district court's misinterpretation of the breadth of the indemnity agreement, a misinterpretation that leads the court to reverse and remand the district court's indemnity judgment.

21

I next consider the insurance coverages. At the outset, I adopt by reference the facts and circumstances set forth in Part IA of the court's opinion. I accept in part and reject in part segments of Part IB and repeat other components of the court's opinion to facilitate and, hopefully, simplify this dissent.

The comprehensive general liability policy issued to MTA by ICSP for the Rogers Avenue station improvement project was part of an "owner controlled insurance program" (OCIP), a program formulated by MTA for most, but not all, of its major projects. OCIPs, also known as wrap-around insurance programs, provide insurance, such as the coverage provided by ICSP, for the contractors or subcontractors providing direct manual or non-manual labor or service personnel at the weatherization construction sites. J.A. 73. An OCIP policy insures against risk of loss arising from, among other things, property damage, personal injury and workers' compensation claims. Endorsement MS #00005 of the ICSP agreement states that the ICSP "policy is primary." J.A. 53. Accordingly, under MTA's OCIP, ICSP was the primary (first to pay) insurer for the Rogers Avenue station improvement project even when MTA's contractors and their subcontractors provided their own contract-mandated insurance coverage. See, e.g., id. at 77. Alpha purchased comprehensive liability coverage for itself and its employees from USF&G and

22

RKK purchased similar coverage from American. MTA and its employees, as required by the contract, were named additional insureds under the USF&G and American contracts. Thus, MTA and its employees were insured under at least these three policies. However, since ICSP is the primary policy for the project, the USF&G and American insurance represents excess coverage which comes into play only if the limits of the primary policy are exhausted. There is no evidence that ICSP's total obligations in this regard have been exceeded. And, although ICSP provided both a defense and indemnification for MTA and *some* of its employees, as well as for Maple and its employees, for the Griffin claim, it has denied coverage for Alpha and RKK and their employees Gray and Combs.

As noted by the court, Alpha and RKK and their insurers, USF&G and American, filed this action seeking a declaratory judgment that Alpha and RKK were insured by the ICSP policy and that their employees, Gray and Combs, were also employees of MTA and, thus, insureds under the ICSP policy. Alpha and RKK likewise sought a declaration that ICSP owed Alpha and RKK and Gray and Combs a duty to defend the Griffin suit and a duty to indemnify and reimburse their insurers USF&G and American for the Griffin settlement contributions made by them in return for the Griffin release. ICSP counterclaimed against Alpha or its insurer, alleging that it is entitled to contribution or

23

indemnity from Alpha or its insurer for the costs it incurred in defending MTA and in paying $400,000 to settle the Griffin lawsuit.

Upon cross-motions for summary judgment, the district court granted judgment in favor of ICSP, finding that clear policy language precluded Alpha and RKK, or their employees, from being insureds under MTA's OCIP policy. The district court found that Alpha and RKK were excluded from the policy because they were not listed as companies on the enrollment list kept by MTA as part of the OCIP. Furthermore, the district court concluded that though possibly qualifying as "Named Insured[s]" under the insuring language of the ICSP policy, Alpha and RKK were specifically excluded from protection by virtue of Endorsement MS #00006 (Endorsement 6)[*] which was appended to the policy. In support of this holding, the district court found that the employees provided to MTA by Alpha and RKK were not endorsed for workers' compensation and employer's liability coverage as

_____

[*] Endorsement 6 provides that "coverage for 'Named Insured(s)' shall be automatically effected based upon issuance of a workers compensation policy as afforded by the wrap-up program/owner controlled insurance program." Endorsement 6 also states that the policy "does not apply to any of the following as an insured: . . . [e]xcept as respects to any contractor or subcontractor who will have employees engaged in work at the project hereof who are not provided workers compensation and employers liability coverage under the owner provided insurance program, unless specifically endorsed to the policy."

required by Endorsement 6. Accordingly, said the district court, such employees were not "insureds" under the ICSP policy and because of this Alpha and RKK were, likewise, not entitled to reimbursement from ICSP. Finally, the court ruled in favor of ICSP on its counterclaim, holding that Alpha was required to reimburse ICSP for the $400,000 ICSP contributed to the Griffin settlement. Alpha, RKK, USF&G and American appeal the district court's judgment.

### III.

On appeal, rather than continuing to argue that they, as entities, are covered by ICSP, Alpha and RKK confine their arguments to the employment status of Gray and Combs as they performed their duties for MTA at Rogers Avenue at the time of Griffin's injury. Such status raises two separate issues, one under Maryland tort law and the other under the insurance contracts. But, both issues affect ICSP's insurance obligations.

### A.

Maryland tort law, and duties and obligations arising thereunder, is not, of course, governed by the content of insurance policies or even the existence, or not, of insurance coverage. Insurance indemnity benefits come into play only

25

after liability to a tort claimant has been determined under Maryland law.

Gray and Combs were furnished to MTA by Alpha and RKK respectively. As established by their MTA contracts, Alpha and RKK were the general or administrative employers of Gray and Combs and MTA was the functioning and controlling employer. Specifically, Alpha, RKK, Gray and Combs had no authority to make changes in the plans and specifications of the Rogers Avenue work or any other portion of the weatherization project to which they were assigned. They had no input into work assignments and were, in fact, dispatched to Rogers Avenue by their immediate MTA supervisor on the day in question. They were directed, supervised and managed on the project by MTA employees and supervisors. Under the agreement, MTA reviewed and approved their qualifications and had the right to accept, or not, their services and to terminate them at any time for any reason. Indeed, MTA was in full control of their actions at the Rogers Avenue site. Upon receiving contract-specified payments from MTA, Alpha and RKK paid Gray and Combs, made and submitted required deductions, paid fringe benefits, if any, and provided workers' compensation benefits, if necessary, although it is virtually certain that under Maryland law MTA also had a workers' compensation undertaking to Gray and Combs as well. In Maryland when an employee is employed jointly by two employers,

26

both are liable, primarily or secondarily, for workers' compensation benefits regardless of any agreements between the two employers. Temp. Staffing, Inc. v. J.J. Haines & Co., 765 A.2d 602, 606 n.7 (Md. 2001). The Code of Maryland Regulations 14.09.01.08 permits a party to implead alleged co-employers in a compensation case. Chaney Enters. Ltd. P'ship v. Windsor, 854 A.2d 233, 246 (Md. Ct. Spec. App. 2004).

Alpha and RKK provided Gray and Combs small tools (rulers and hand levels), safety equipment (hard hats and safety vests) and mobile phones all of which items were also available to MTA personnel. For tort liability purposes, the recognized factors in determining the existence of an employment relationship under Maryland law are: (1) who has the power to select and hire the employee; (2) who pays the wages; (3) who has the power to discharge; (4) who has the power to control the employee's conduct; and (5) whether the work is part of the regular business of the employer. Mackall v. Zayre Corp., 443 A.2d 98, 103 (Md. 1982). If both employers have the power to perform a number of these five functions, the employee will be considered an employee of both. Id. Of these five factors, "control is paramount and, in most cases, decisive." Great Atl. & Pac. Tea Co. v. Imbraguglio, 697 A.2d 885, 894 (Md. 1997). Thus, under the circumstances of this case, Gray and Combs were, under Maryland precedent, borrowed servants. And, in this regard, it

27

is a settled principle of Maryland law that a worker may simultaneously be the employee of two employers. Lovelace v. Anderson, 785 A.2d 726, 741 (Md. 2001). That an employee can concurrently serve two employers is not a novel concept in Maryland. Id. Thus, the initial question is whether under the applicable facts, MTA, as a joint employer, became vicariously liable to Griffin for negligent acts, if any, performed by Gray and Combs at the Rogers Avenue station at the time Griffin was injured. As a matter of Maryland law, there seems to be little doubt that MTA did become liable. Gray and Combs were going about MTA's business, acting within the scope of their contracted-for relationship with MTA and, at the time of the incident with Griffin, were under the complete control of MTA supervisors. See S. Mgmt. Corp. v. Taha, 836 A.2d 627, 638 (Md. 2003).

As a panel of this circuit previously noted:

The borrowed servant doctrine arose as a means of determining which of two employers, the general employer or the borrowing employer, should be held liable for the tortious acts of an employee whose conduct injured a third party and who, although in the general employ of the former, was performing a task for the latter. See Standard Oil Co. v. Anderson, 212 U.S. 215, 220 (1909) ("[W]hen . . . an attempt is made to impose upon the master the liability for [the servant's tortious acts], it sometimes becomes necessary to inquire who was the master at the very time of the negligent act or omission."). The Supreme Court summed up the doctrine as follows: "One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred .

28

> . . to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation." Id.

NVR, Inc. v. Just Temps, Inc., 31 F. App'x 805, 807 (4th Cir. 2002) (alterations in original).

Thus, if Gray's and/or Combs's acts of negligence, if any, were the cause, in whole or in part, of Griffin's damages, MTA was vicariously liable for the consequences of such behavior. So, whether or not Gray and Combs were insureds under the ICSP policy, MTA had tort liability to Griffin covered by ICSP's primary policy. With regard to MTA's responsibility to Griffin, ICSP's insuring agreement states: "[ICSP] will pay those sums that the insured [MTA] becomes legally obligated to pay . . . because of [damages] to which this insurance applies." J.A. 24. The ICSP insurance clearly applies in this situation and ICSP as primary carrier is obligated to first pay all MTA losses within the limits of its coverage.

While Maryland law permits contractual allocation of risk between a general employer and a borrowing employer under the borrowed servant doctrine, Sea Land Industries, Inc. v. General Ship Repair Corp., 530 F. Supp. 550, 563 (D. Md. 1982), the record discloses no indemnity agreement whatever between MTA and RKK and the indemnity agreement between MTA and Alpha set forth above fails to allocate all risk of a controlling employer to a non-controlling employer or if it does, the contract is void

29

under that reading.  Bethlehem Steel Corp. v. G.C. Zarnas & Co., 498 A.2d 605, 610-11 (Md. 1985).  And, this court has already unanimously determined that the MTA/Alpha agreement does not shift all risk of loss from MTA to Alpha.

Accordingly, at the bottom line, if Gray and/or Combs were negligent, MTA, as their employer, incurred liability to Griffin arising out of such acts under the doctrine of respondeat superior.  Thus, ICSP had a duty to MTA under the coverage extended by its primary policy to pay for any provable damages suffered by Griffin.  If negligent, Gray and Combs were, of course, also jointly and severally liable to Griffin.  Taha, 836 A.2d at 638.  However, there is no evidence, or even an allegation, in the record that Gray and Combs were solely liable for the injury.  Indeed, the record indicates that Gray and Combs were dispatched to Rogers Avenue by MTA upon receipt of a report of a pre-existing safety hazard at that location, possibly the handiwork of Maple, the general contractor.  On these facts, ICSP denied coverage under its policy to Gray and Combs who then looked to USF&G and American, the excess carriers, for indemnification.  USF&G and American responded to ICSP's primary insurance obligations and are now entitled to indemnification by and reimbursement from ICSP.

30

Analysis under Maryland tort law does not end the inquiry into ICSP's responsibilities to Gray and Combs. As noted above, even though an employer is vicariously liable for the negligent acts of its employee, the employee may also be personally liable to a tort claimant and possibly, in a few instances, to a totally blameless employer. Hartford Accident & Indemnity Co. v. Scarlett Harbor Assocs. Ltd., P'ship, 674 A.2d 106, 135 (Md. Ct. Spec. App. 1996). As such, Gray and Combs had an insurable interest in acquiring comprehensive liability coverage for themselves to provide indemnification for such potential obligations. As employees of Alpha or RKK, they acquired such coverage through the USF&G or American policies. But, if Gray and Combs were also employees of MTA as defined in the ICSP policy, they acquired their primary indemnity coverage under that policy. Such coverage would entitle them to a policy defense and indemnification for liability arising from any actionable behavior.

With that background, I turn to the key question in this coverage dispute: were Gray and Combs ICSP-covered employees of MTA at the time of the Griffin incident? I turn to the policy's language for the answer. I digress, however, to mention some interpretational rules applied in Maryland insurance contract disputes. The initial burden of proof is placed upon an insured

31

seeking coverage under a policy's insuring language. Perdue Farms Inc. Co. v. Nat'l Union Fire Ins. Co., 197 F. Supp. 2d 370, 376 (D. Md. 2002). However, when the insurer seeks to diminish or restrict, by endorsement or written addendum, otherwise proffered policy coverages, the burden of proof is reversed because the exceptions or exclusions essentially become affirmative defenses. As such, validation of the application and efficacy of policy limitations is the burden of the insurer. Mut. Fire Ins. Co. v. Ackerman, 872 A.2d 110, 114 (Md. Ct. Spec. App. 2005). Cf. Boyd & Stevenson Coal Co. v. Director, Office of Workers' Compensation Programs, 407 F.3d 663 (4th Cir. 2005) (applying applicable state insurance law in construing insurance contract). Any coverage exclusions or exceptions in policy definitions must be conspicuous and plainly and clearly set forth in the contract. Megonnell v. United States Auto. Ass'n, 796 A.2d 758, 772 (Md. 2002). Also, terms of exclusion cannot be extended by interpretation but must be given strict and narrow construction. Id. Since exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of finding coverage. Id.

As stated by the court, the district court relied upon Endorsement 6 and some related collateral actions to answer the question posed above in the negative. Endorsement 6, according

32

to the district court, required a contractor (here Alpha or RKK) to "effect" ICSP coverage by specifically endorsing its employees for workers' compensation and employer liability coverage "to the policy." Finding no such endorsement in the OCIP spreadsheet maintained by MTA, the district court concluded that Gray and Combs were not ICSP insureds.

The district court additionally opined, somewhat inconsistently, that it "need not determine" whether Gray and Combs could be properly characterized as employees or leased workers of MTA because to do so would "circumvent" the endorsement's "clear exclusion" under the policy and render the endorsement superfluous because it would permit Alpha and RKK as uninsured entities under the ICSP policy to use an equitable subrogation remedy to override a written policy exclusion. J.A. 780. These conclusions are problematic for at least three reasons.

First, an ambiguity exists as to who the district court believes is clearly excluded by the endorsement—the contractors, the contractors' employees or both. Second, while Endorsement 6 uses the nonendorsement of a contractor's employees for workers' compensation benefits and employer liability coverage as the key to excluding the *contractor,* here Alpha and RKK, from ICSP coverage, nothing in the endorsement excludes the contractor's separately insurable workers, especially ICSP-policy-defined MTA

33

leased workers.  So, there is no "clear exclusion" of Gray and Combs stated, especially when the aforementioned rules of interpretation are correctly applied.

Third, Endorsement 6 is not superfluous.  The endorsement may be inoperative when a contractor's worker is entitled to ICSP insurance coverage under policy language unrelated to Endorsement 6's "contractor" exclusion.  But, otherwise, the endorsement is fully effective to fulfill its purpose.  Indeed, it has served to exclude Alpha and RKK and any employees not under the control of MTA, if any, performing services for the weatherization project.  But even if Endorsement 6 is deemed superfluous and collides with the other clearly stated insuring language in the ICSP policy, the endorsement must yield because terms of exclusion cannot be extended by interpretation but must be given strict and narrow construction.  Megonnell, 796 A.2d at 772.  I turn now to the coverage language.

Section II.2.a. of the ICSP policy states that an MTA employee is "an insured."  J.A. 29.  Section V.5. of the contract further notes that an employee "includes a 'leased worker'" but such an employee "does not include a 'temporary worker.'"  Id. at 32.  The ICSP policy defines "leased worker" as "a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business."  Id. at 33.  A

34

"temporary worker" is defined as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." Id. at 34-35.

In Gray's case, he was assigned to MTA by Alpha in July 2002 and worked solely and continuously thereafter on the weatherization improvement project. He testified that during his Alpha employment, he worked only for MTA. And, there is no evidence that he worked seasonally or short-term or that he substituted for anyone. In Combs's case, he had worked at MTA long enough that he had reached the highest class of inspector.

Although the terms "leased worker" and "temporary worker" appear in numerous insurance contracts, and are mentioned in numerous court opinions, there is a dearth of cases definitionally analyzing leased worker status. As noted by the parties, Scottsdale Ins. Co. v. Torres, 561 F.3d 74 (1st Cir. 2009), stands almost alone in this regard. We look to it for some guidance.

In Torres (a case not quite factually on point because it involved an "employer's liability" exclusion under which a "temporary worker," as defined, was protected against the negligent acts of an employer but a "leased worker," as defined, received, instead, scheduled workers' compensation benefits), Venturi hired individuals and placed them with client companies for varying lengths of time. CTC contracted with Venturi to

35

supplement its workforce. Venturi paid the supplied worker, withheld taxes and took responsibility for workers' compensation benefits. While Venturi retained the right to hire, place, discipline and terminate its employees, CTC was responsible for training, supervision and assigning work tasks. CTC could ask a worker not to return. Torres worked from August to December 2003 and from January 2004, except for a week in June, until August 2004, when an accident occurred. While the Venturi/CTC contract did not mention the term "lease," it used definitions of "leased" and "temporary" workers identical to those used in this case. On these facts, the First Circuit found Venturi to be a "labor-leasing firm," found the agreement to be a lease and found that Torres was a "leased" worker within the applicable definition. Id. at 78. In Torres, evidence not present in this case made the temporary worker exclusion a fact question. In this case, however, under the narrow interpretation to be given coverage limiting language, it is clear that Gray and Combs do not fit within the "temporary worker" definition. They were leased workers under the ICSP policy as a matter of law.

As leased workers, Gray and Combs were insured employees of MTA and, thus, fully insured by the ICSP policy. Even so, ICSP denied them coverage. At that point, Gray and Combs looked to USF&G and American who provided them with a defense and indemnified them from losses in the amount of $400,000.

36

Accordingly, USF&G and American, as excess carriers to the primary policy issued by ICSP, are entitled to step into the shoes of their insureds Gray and Combs and to be reimbursed by ICSP under the doctrine of equitable subrogation. See Fireman's Fund v. Cont'l Ins. Co., 519 A.2d 202, 204 (Md. 1987) ("Equitable subrogation arises by operation of law when a person pays the debt of another under such circumstances that equity entitles the person to reimbursement.").

In Fireman's Fund, Glen Falls Insurance, a subsidiary of Continental, issued Publication Press a primary comprehensive general liability policy with limits of $500,000. Fireman's issued Publication an excess policy with a $2 million limit. A former employee sued Publication for $15 million in compensatory and $15 million in punitive damages. Although warned by its counsel of the likelihood of a verdict in excess of its policy limits, Glen Falls repeatedly refused to settle within the limits. Upon the rendering of a jury verdict of $1 million, settled for $900,000, Fireman's was forced to pay the $400,000 excess. The Maryland Court of Appeals ruled that Fireman's was entitled under the doctrine of equitable subrogation to step into the shoes of Publication to pursue Publication's bad faith claim (for not settling within policy limits) against Glen Falls to recover Fireman's payment of $400,000. Id. at 205.

37

Applying this precedent, USF&G and American are entitled to reimbursement from ICSP in the amount of $400,000 plus Gray's and Combs's defense costs. I dissent from the court's conclusion to the contrary.